Kirk WOOL

v.

Cornelius HOGAN and Richard Bashaw

Civ. A. No. 79–57.

United States District Court,
D. Vermont.

Jan. 14, 1981.

Thomas B. Bailey, Hoff, Wilson & Powell, Burlington, Vt., for plaintiff.

Peter M. Nowlan, Asst. Atty. Gen., Montpelier, Vt., for defendants.

## OPINION AND ORDER

COFFRIN, District Judge.

This is an action pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(a)(3), by a prisoner of the State of Vermont against the Vermont Commissioner of Corrections and the Superintendent of the St. Albans Correctional Diagnostic and Treatment Facility (CDTF).[1] The Complaint alleges that defendants without a compelling state interest interfered with plaintiff's right to maintain family relationships and to marry. Furthermore, plaintiff claims that defendants denied him his right of association by requiring that his visitors submit to strip searches prior to visitation; that the strip searches "chilled" his first amendment rights and thus constituted cruel and unusual punishment prohibited by the eighth amendment; and that the strip searches were unreasonable searches proscribed by the fourth amendment.

Plaintiff seeks compensatory and punitive damages. The case is presently before us on defendants' motion for summary judgment.

### Facts

Plaintiff is a twenty-one year old prisoner presently serving concurrent six to ten year sentences with a consecutive two and one-half to five year term for escape.

Plaintiff's original sentence began in January 1977 and defendants transferred him to CDTF in October 1977. At CDTF, plaintiff received weekly contact visits from his girlfriend, Kathy Barber, and their infant daughter, Melissa.[2] In January 1978, defendants allegedly began requiring Kathy and Melissa to submit to strip searches prior to contact visits with plaintiff. If Kathy consented the CDTF staff performed the strip search;[3] if she refused defendants

---

1. Plaintiff names Cornelius Hogan and Richard Bashaw as defendants. Hogan was the Vermont Commissioner of Corrections and Bashaw was the Superintendent at CDTF when plaintiff filed his Complaint. Hogan is no longer with the department and Bashaw has been promoted to Director of Adult Facilities. Since we assume that plaintiff sued defendants in their official capacities, we substitute as defendants the present officials, Commissioner William Ciuros and Acting Superintendent Raymond Pilette, pursuant to Fed.R.Civ.P. 25(d)(1).

2. Plaintiff alleges paternity. Affidavit of Kirk Wool ¶ 4 (filed Nov. 30, 1979). Thus for the purposes of this motion, we assume Melissa to be plaintiff's and Kathy's daughter.

3. Defendants utilize the following procedure:
   The supervising officer of the St. Albans CDTF has the exclusive authority to decide which visitors will be requested to submit to a strip search before entering the facility.
   No visitor is requested to submit to a strip search unless the supervising officer has a real suspicion that the particular visitor in

prevented her and Melissa from visiting plaintiff.[4]

Plaintiff applied for permission to marry Kathy in January 1978. CDTF Chaplain Rev. G. Yost interviewed plaintiff and Kathy and submitted a report pursuant to departmental policy.[5] He opined that four factors militated against the marriage: (1) plaintiff and Kathy lacked a sufficient commitment to each other for marriage at that time; (2) they lacked the means to support a family; (3) they would be separated for several years because of plaintiff's incarceration; and (4) plaintiff lacked the maturity needed for marriage. Based on that report and plaintiff's age at that time (nineteen years) and length of remaining sentence, defendants denied plaintiff's request.

In June 1978, Kathy refused to be strip searched and defendants consequently denied her a visit with plaintiff. Plaintiff filed written grievances and sought administrative remedies but defendants' strip search demands continued. Plaintiff's relationship with Kathy and their child eventually deteriorated, allegedly because defendant's strip search policy discouraged their visits.

### Discussion

The Supreme Court has articulated several principles to guide our analysis. *Bell v. Wolfish*, 441 U.S. 520, 545–48, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Generally, the Court has held that although convicted prisoners do not forfeit all their rights by reason of their imprisonment, their rights are subject to restrictions and limitations. "The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights." *Id.* at 546, 99 S.Ct. at 1878. The Court has identified the maintenance of institutional security and the preservation of internal order and discipline as such legitimate goals. The Court has also recog-

---

question may be attempting to transport contraband into the facility.

No strip searches are conducted without first obtaining the visitor's consent. A form evidencing this consent, as well as a document recording the specific reasons for requesting the strip search, are maintained in the file of the visited inmate.

Once the visitor has consented to a strip search, it is conducted in the following manner:

a) The visitor accompanies two correctional staff members of the same sex to a private room;

b) The visitor is requested to empty all pockets;

c) The visitor is then requested to undress, as each article of clothing is removed it is checked by a staff member to insure no contraband is secreted within it;

d) The visitor is then requested to comb out his or her hair;

e) The visitor's body is visually inspected by the correctional employee;

f) The visitor is then permitted to dress and leave the room.

At no time during a strip search do the procedures require *or permit* the touching of the visitor by a staff member.

Affidavit of Richard L. Bashaw ¶¶ 7–11 (filed Oct. 29, 1979) (emphasis in original).

4. Non-contact visitation did not become operational until the latter part of 1978. Therefore, at the time of this action a visitor who refused to submit to a strip search could not visit at all.

Now, however, alternative means of visitation are available for visitors who refuse a strip search.

5. Vermont Department of Corrections Policy # 985:

*POLICY DESCRIPTION*

Residents who wish to marry will submit a letter to the Superintendent stating the name, address, and other pertinent information about their intended. The Superintendent or his designee will then interview the resident and suggest that the resident meet with a qualified counselor of their choice. This person may be a facility counselor or parole officer, clergy person, or any other member of the community. The purpose of this meeting is to help the resident further understand the relationship of the proposed marriage to his total program plan. The Superintendent may suggest that the intended participate in the meeting with a qualified counselor, either at the same time as the resident or at a separate meeting.

The counselor will make a report and recommendation to the Superintendent.

The Superintendent will make his report and recommendation to the Director of Adult Facilities, stating the reasons for his recommendation.

The Director will make a decision based on available information and will notify the resident and the Superintendent.

·    ·    ·    ·    ·

nized that the daily operation of a corrections facility is a formidable task.

> Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. [817] at 827 [94 S.Ct. 2800 at 2806, 41 L.Ed.2d 495].

*Bell*, 441 U.S. at 547–48, 99 S.Ct. at 1878 (footnotes and citations omitted). Therefore, unless we find that defendants exaggerated their response to considerations of security, discipline, and internal order at CDTF, we will generally defer to their policy choices.

■ We first address the preliminary question of whether plaintiff can assert the fourth amendment rights of Kathy and Melissa. The Supreme Court has established that "limitations on a litigant's assertion of *jus tertii* are not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren*, 429 U.S. 190, 193, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976). Thus, we have the discretion to decide what degree of suspicion, if any, defendants must have before requiring visitors to submit to strip searches as a condition of visitation. We choose not to rule on that issue here but

note our approval of the "real suspicion" standard which defendants have adopted. N.3, *supra*.[6]

■ We recognize that a strip search is a serious invasion of an individual's privacy yet we believe that Kathy should raise the fourth amendment issue herself.[7] We do not think that denying plaintiff's assertion of *jus tertii* results in a dilution of Kathy's claims. See Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 425 (1974). Quite to the contrary, we are concerned about the collateral estoppel effects of a different decision and the possibility of double recovery since plaintiff prays for damages and not injunctive relief. Therefore, we find that plaintiff's assertion of *jus tertii* is inappropriate and we need not discuss his fourth amendment claim. Accordingly, since plaintiff's personal rights do not protect his visitors' freedom from unreasonable searches, his allegation that defendants conditioned his visits on unwarranted searches is immaterial.

■ Plaintiff claims that the penumbras of the first, third, fourth, fifth, ninth, and fourteenth amendments create a fundamental right to maintain family relationships while in prison. Strip searches of Kathy and Melissa as a prerequisite to visitation allegedly interfered with plaintiff's exercise of that right. Plaintiff, however, has neglected to detail the scope of that supposed right. Certainly plaintiff's isolation from Kathy and Melissa, a natural and indeed inevitable consequence of his incarceration, has some impact on his ability to function as a companion and parent. Such a result cannot be unconstitutional. As we understand it, maintaining a family relationship requires communication, compassion, and constancy. We fail to see how defendants' policy of strip searching visitors prevented

---

**6.** Plaintiff does not question the "real suspicion" standard but doubts that it was applied in the case at hand. If it was, he claims he was denied the opportunity to contest the correctness of the finding. However, we can conceive of no fundamental right of plaintiff's which was violated by a failure of the supervising official to either justify or explain his actions to the plaintiff and none has been called to our attention.

**7.** Even if we accepted plaintiff's argument that as a practical matter Kathy is unlikely to bring a claim for herself or on behalf of her daughter, we do not think that her choice not to assert her rights provides plaintiff with standing on this issue.

plaintiff from exercising such a right as we have defined it.

Assuming arguendo that plaintiff has a fundamental right to maintain family relationships while in prison, his claim that defendants unconstitutionally interfered with that right and thereby caused the termination of a protected relationship is without merit. Plaintiff could have maintained his family relationship by mail or by telephone. Affidavit of Richard L. Bashaw ¶ 2 (filed February 12, 1980). Moreover, defendants did not absolutely prevent plaintiff from visiting with Kathy and Melissa, they only conditioned the visitation upon a strip search. For reasons of security, discipline, and internal order defendants have an interest in restricting the flow of weapons and contraband into CDTF. The means they have selected, strip searching visitors suspected of transporting weapons or contraband, is not an exaggerated response to that interest. Furthermore, their policy has the beneficial result of allowing minimally supervised contact visits. Therefore, we grant defendant's motion insofar as plaintiff's cause of action is grounded in the right to maintain family relationships.

Plaintiff also claims that the due process clause of the fourteenth amendment and his constitutional "right of privacy" provide him with a fundamental right to marry while in prison. Plaintiff asserts that defendants' denial of his request to marry Kathy, without a compelling state interest, violated that right.

*Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), is the leading case regarding the constitutional right to marry. In *Zablocki*, the Supreme Court reviewed the constitutionality of a state statute requiring a parent without child custody but with court-imposed support obligations to obtain court approval before remarrying. The Court reasoned that because the state courts withheld approval unless convinced that the designated children would not become public charges, the

statute prevented or unlawfully burdened the right of certain persons to marry, and thus violated the fourteenth amendment's equal protection clause. *Id.* at 387, 98 S.Ct. at 681. Plaintiff argues that this holding requires us to find that defendants must have a compelling interest for denying his marriage request. We disagree.

█ The fundamental nature of the right to marry arises from an individual's interest in being free from governmental interference in making important personal decisions. *Carey v. Population Services International*, 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977); *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).

> It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships.... [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society.

*Zablocki*, 434 U.S. at 386, 98 S.Ct. at 681. But because plaintiff is incarcerated his right to marry, if he has one, does not include the rights of cohabitation, sexual intercourse, or procreation. Therefore, defendants only denied him the right to go through the formal ceremony of marriage, something that, standing alone, does not rise to the level of a fundamental interest in our opinion. *Cf. Johnson v. Rockefeller*, 365 F.Supp. 377, 380 (S.D.N.Y.1973), *aff'd mem. sub nom. Butler v. Wilson*, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974) (statute prohibiting the marriage of life-term prisoners held constitutional).

Assuming arguendo that plaintiff has a fundamental right to participate in a marriage ceremony, defendants did not permanently prevent his exercise of that right.[8]

---

**8.** Defendants claim that they agreed to reconsider plaintiff's marriage request but before acting thereon plaintiff escaped. Upon his return to custody he did not pursue his request. For the purposes of this motion, however, we consider defendants' decision to have been final.

Plaintiff controlled most of the factors effective in defendants' denial of his request, and presumably he could have altered some of them with the result that defendants may have permitted the marriage. In any event, plaintiff is free to marry at any time following his release.

States have traditionally had a significant interest in the marriage relation. *Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975); *Maynard v. Hill*, 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed.2d 654 (1888); *Pennoyer v. Neff*, 95 U.S. 714, 734–35, 24 L.Ed. 565 (1878).

> Surely, for example, a State may legitimately say that no one can marry his or her sibling, that no one can marry who is not at least 14 years old, that no one can marry without first passing an examination for venereal disease, or that no one can marry who has a living husband or wife.

*Zablocki*, 434 U.S. at 392, 98 S.Ct. at 684 (Stewart, J., concurring). In addition, defendants have a specific interest in plaintiff's rehabilitation, both in terms of his programming at CDTF and his living situation following release. We cannot conclude that defendants acted unreasonably or irresponsibly in denying plaintiff's request in light of those interests.

Our reasoning is supported by analogy to a prisoner's rights in another area. The right to vote in state elections is a fundamental right, *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972), and yet a state can disenfranchise convicted felons. *Richardson v. Ramirez*, 418 U.S. 24, 53–55, 94 S.Ct. 2655, 2670, 41 L.Ed.2d 551 (1974); *Green v. Board of Elections*, 380 F.2d 445, 451 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). Thus a state with an interest apparently less significant than the one present here can permanently deny a person in plaintiff's position a right more directly founded upon the Constitution than that of marriage.

Persuasive authority supports our position. The Sixth Circuit in a *per curiam* opinion held that Ohio's unwritten policy forbidding the marriage of incarcerated persons passed constitutional muster. *Hudson v. Rhodes*, 579 F.2d 46 (6th Cir. 1978), *cert. denied*, 440 U.S. 919, 99 S.Ct. 1241, 59 L.Ed.2d 470 (1979). Therefore, we grant defendants' motion insofar as plaintiff's cause of action is grounded in the right to marry.

Plaintiff also claims that the first amendment gives him a right to associate physically with his family and friends. He asserts that defendants, by requiring Kathy and Melissa to submit to strip searches prior to visitation, illegally intruded upon that right.

Clearly, free members of our society have a right of physical association. That right, however, is significantly curtailed upon conviction of violating the criminal laws. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 129–33, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). Courts have interpreted that curtailment to mean that convicted prisoners have no absolute constitutional right to visitation. *Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir. 1980); *White v. Keller*, 438 F.Supp. 110, 115 (D.Md.1977), *aff'd*, 588 F.2d 913 (4th Cir. 1978). Nevertheless, defendants acknowledge the usefulness of prison visitation and claim that they have designed a policy that appropriately balances prisoners' visiting rights with CDTF's security needs. We agree.

Plaintiff's visiting rights are at best something less than fundamental. *Bono v. Saxbe*, 450 F.Supp. 934, 947 (E.D.Ill.1978); *White*, 438 F.Supp. at 118; *accord, Wallace v. Hutto*, 80 F.R.D. 739, 740 (W.D.Va.1978), *aff'd mem.*, 601 F.2d 583 (4th Cir. 1979); *see Jones v. Diamond*, 594 F.2d 997, 1013 (5th Cir. 1979); *Fennell v. Carlson*, 466 F.Supp. 56, 59 (W.D.Okla.1978). We find that the distinction plaintiff would have us draw between family and general visitation is not constitutionally significant. Moreover, we again note that defendants did not prevent plaintiff from receiving visitors,

they only conditioned the visits upon his visitors' submitting to strip searches.

As we held above, defendants have an interest in restricting the flow of weapons and contraband into CDTF. The means they have selected, strip searching visitors suspected of transporting contraband, is not an exaggerated means of protecting that interest. Defendants justifiably fear that a visitor might secrete contraband, especially drugs, beneath clothing so that CDTF staff could not detect it by visual inspection or with a metal scanner. We need not determine whether less drastic alternatives are available because we defer to the defendants' expertise in the area of contraband control. See Bell, 441 U.S. at 548, 99 S.Ct. at 1878; Pell v. Procunier, 417 U.S. 817, 827 (1974); Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Therefore, we grant defendants' motion insofar as plaintiff's claim is grounded on the right of physical association.

Lastly, plaintiff claims that the strip searches "chilled" his first amendment right of association and thus constituted cruel and unusual punishment prohibited by the eighth amendment.

The "chilling effect" doctrine emerged from challenges to overbroad statutes in first amendment contexts. See, e. g., Dombrowski v. Pfister, 380 U.S. 479, 486–89, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965); New York Times Co. v. Sullivan, 376 U.S. 254, 267–72, 84 S.Ct. 710, 719, 11 L.Ed.2d 686 (1964). First amendment freedoms are "delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Therefore, first amendment freedoms need "breathing room" to survive.

We find that plaintiff has mistakenly relied on the "chilling effects" doctrine. In our opinion the doctrine does not protect a prisoner's right to associate with family and friends. Since we found that plaintiff's first amendment right to associate can be restricted by defendants, a fortiori, his right to associate can be "chilled" by defendants without constitutional consequence.

Assuming arguendo that the "supremely precious" first amendment freedoms include plaintiff's right to associate, the Supreme Court has never considered the existence of a "chilling effect", in and of itself, a sufficient basis for prohibiting state action. Younger v. Harris, 401 U.S. 37, 51, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971).

> Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so.

Id. We find that defendants' interest in contraband control is more than adequate to justify a "chilling effect," if any exists, on plaintiff's first amendment rights.

Accordingly, for the foregoing reasons, we grant defendants' motion for summary judgment. The Clerk will issue judgment for the defendants. No costs.