Leonard SAFLEY, et al., and Mary Webb, et al., individually and as a class of similarly situated people, Plaintiffs,

v.

William R. TURNER, et al., and David Blackwell, et al., Defendants.

Nos. 81–0891–CV–W–6, 82–0072–CV–W–6.

United States District Court, W.D. Missouri, W.D.

May 7, 1984.

Floyd R. Finch, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for plaintiffs.

Henry Herschel, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

### FINDINGS OF FACT

1. The Renz Correctional Institution (hereinafter "Renz") contains male and female prisoners. Most of the female inmates located at Renz are medium and maximum security level offenders. Some of the male inmates need special protection from other prisoners in Missouri penal institutions.

2. A class action has been certified to determine the constitutional status of inmate-to-inmate correspondence, visitation privileges relating to former inmates, and the right to marry. The focus of inquiry is

the Renz institution, but the rights in issue are not restricted to Renz.

3. Renz has a minimum security perimeter without the added security elements, such as guard towers or walls that other maximum security units would possess. The other security institutions within the Missouri Correctional System have varying differences in perimeters, in population, and in security procedures and facilities.

4. Correspondence between inmates is supposedly regulated by divisional regulation 20–118.010(e):

Correspondence with immediate family members or inmates in other correctional institutions will be permitted. Such correspondence may be permitted between non-family members if the classification/treatment team of each inmate deems it in the best interests of the parties involved. Correspondence between inmates in all division institutions will be permitted concerning legal matters.

5. There have been instances where the divisional correspondence regulation has been violated. For example:

a. Letters have been stopped without notice or explanation to either the correspondent or the recipient;

b. Mail to and from persons not incarcerated has been stopped or refused on factually incorrect grounds or without legitimate justification;

c. Mail to incarcerated family members has been refused or returned without notification or explanation;

d. Mail with former inmates has been refused or returned without notification or explanation.

6. The provisions of the divisional correspondence regulation allowing the classification/treatment team of each inmate to prohibit inmate-to-inmate correspondence have not been followed at Renz. Theoretically the classification/treatment team uses psychological reports, conduct violations, and progress reports in deciding whether to permit correspondence. At Renz, however, the rule as practiced is that inmates may not write non-family inmates or receive mail from non-family inmates.

The more restrictive practice is set forth in the Renz Inmate Orientation Booklet presented to each inmate upon arrival at Renz. The restrictive rule at Renz is commonly known throughout the Missouri Correctional System.

7. The Renz rule against inmate-to-inmate correspondence is enforced without a determination that the security or order of Renz or the rehabilitation of the inmate would be harmed by allowing the particular correspondence to proceed and without a determination that there is no less restrictive alternative to resolve any legitimate concerns of the Department of Corrections short of prohibiting all correspondence.

8. Inmates at most institutions in the Missouri Correctional System are permitted to correspond with inmates in most other institutions. The greatest restriction on inmate correspondence is practiced at Renz.

9. While there is no regulation that prohibits inmates from corresponding with persons who are not incarcerated, on at least one occasion outgoing mail to a non-incarcerated person was returned to the inmate and delivery refused because of derogatory remarks made about prison staff members.

10. Correspondence between inmates has been denied solely on the basis of the inmate's marital status.

11. Under an unwritten rule at Renz, prior approval is required before an inmate may write to another inmate regarding legal matters. Absent this approval, inmate-to-inmate legal mail routinely is opened, stopped, and refused in violation of the Department of Corrections' written rule.

12. The Division of Corrections maintains a computer listing of each inmate's potential enemies. This listing is available to all correctional officials and accompanies the inmate on transfers from institution to institution.

13. Correspondence between inmates has been denied despite evidence that the

correspondence was desired simply to maintain wholesome friendships.

14. The staff at Renz has been able to scan and control outgoing and incoming mail, including inmate-to-inmate correspondence.

15. Prior to December of 1983, the Division of Corrections operated under an inmate marriage rule, designated 20.117.050, which (a) did not obligate the Missouri Division of Correction to assist an inmate who wanted to get married, but (b) did not authorize the superintendents of the various institutions to prohibit inmates from getting married. Inmates at Renz were, however, frequently denied permission to be married.

16. On December 1, 1983, after this litigation was filed, the Division of Corrections promulgated a new regulation which placed a burden upon the inmate to provide the institution with a compelling reason to permit an inmate marriage while the inmate is incarcerated.

17. At Renz female inmates have been refused permission to marry on several occasions on the unexplained ground that the proposed marriage was not in their "best interest," in the opinion of the superintendent. Marriage requests also have been denied because of an inmate's prior history of relationships with men.

18. Inmates in correctional institutions other than Renz and the Chillicothe Correctional Center (for women) routinely are allowed to be married upon request, assuming they otherwise satisfy Missouri's statutory requirements for marriage. Restrictions are exercised most strictly at Renz and Chillicothe. The restrictions applicable to female inmates are apparently generally motivated by "protective" attitudes.

19. The marriage of a number of inmates has been delayed or forbidden because of the pendency of this lawsuit. While this practice may have been unwisely sanctioned by defendants' prior counsel, it has the appearance of penalizing the inmate population because some inmates have chosen to litigate.

20. The current inmate marriage rule places an unreasonable burden upon the inmate to prove that there are "compelling" reasons for the marriage. The term "compelling" is not defined. Defendants, however, suggest that a reason for marriage normally would not be considered compelling unless the relationship had resulted in a pregnancy or an illegitimate child prior to the request.

21. Inmates have been informed that Renz does not permit marriages.

22. There is regular transportation between most of the correctional facilities within the Missouri System for medical, dental and transfer reasons and to transport nursing aides from Renz to the Missouri State Penitentiary. Inmates also travel for court appearances. Defendants have been able to successfully handle the security problems.

23. Renz has a regulation prohibiting visitation by former inmates for a period of six months. Regulation 618.020(5)(D) provides that:

> [t]he existence of a criminal record does not constitute a barrier to visiting privileges. Each proposed visitor shall be considered individually by the casework staff and superintendent after six (6) months on release status. Individuals on parole status and conditional release desiring to visit residents of the institution must have written approval by the parole officer prior to final decision on [sic] the casework staff and the superintendent.

24. Visitation of prisoners by former inmates is permitted after they have been in a non-prison setting for six months. While the six month period admittedly is arbitrary, in the sense that five or seven months would serve the same interest, it is based partly on the security interest of the institution and partly on the belief that it is in the best rehabilitative interest of the inmate to sever ties with the prison environment for a period of time.

25. After the six month period has passed, the former inmate is then approved or disapproved in the same manner and by

the same criteria as would be applied to any other prospective visitor to the institution.

26. All visitors must be approved by a review of a written application. Unapproved visitors are not permitted entrance to Renz except under exceptional circumstances.

27. Visitations by former inmates for the purpose of attending religious meeting or self-help meetings such as Alcoholics Anonymous have been denied because of the absolute, non-discretionary application of the six month non-visitation rule.

28. Inmates have not been informed of their right to participate in a team with correctional officials in making decisions concerning the inmate's status. The "team concept" has not been described to inmates; the inmates have not been informed of their right to participate in decision-making other than as applicants.

29. Inmates have been occasionally threatened with the loss of writing privileges and visitation privileges with family members for attempting to exercise their correspondence and marriage rights.

30. Inmates have occasionally been threatened with the loss of parole and of parole privileges for attempting to exercise their marriage, correspondence, and visitation rights.

31. Inmates have occasionally been harassed and threatened if they pursue grievances in an attempt to exercise their correspondence and marriage rights.

32. Inmates have occasionally been threatened with the loss of custody of their children if they pursue their marriage rights.

33. Several of the plaintiffs and their witnesses are reasonably concerned that their testimony has made them the subject of retaliation or harassment by employees of the Department of Corrections.

34. Insofar as marriage, correspondence, and visitation are concerned the grievance process has had little, if any, effect upon a superintendent's decision. In actual practice, when an inmate writes a letter of complaint to the Director of the Division of Correction, the Director's response is written by the superintendent whose decision is the subject of complaint. When a grievance is taken to the Director, the Director's staff prepares the response without contacting the inmate, based upon information provided by the inmate's superintendent and his staff.

35. The grievance process has been occasionally interfered with by Superintendent Turner.

36. Len Safley met P.J. Watson (a female inmate) at Renz where they became friends.

37. Safley and Watson were familiar with an unwritten policy followed by Renz whereby if any male and female inmate developed a close relationship or a physical relationship one of the two inmates would be transferred ("rolled") to another institution.

38. Shortly after a relationship between Safley and Watson had developed, and after an incident that may now be described as a noisy "lovers' quarrel," Safley was transferred to the Ozark Correctional Center at Fordland, Missouri.

39. Correspondence between Safley and Watson was denied for the reason that it was not in Watson's best interests. After Safley was transferred to the Tipton Pre-Release Center, Renz continued to refuse correspondence from Safley to Watson. The same was true after he was transferred to the Kansas City Honor Center.

40. In order to correspond with Watson, Safley opened a post office box and used a pseudonym, "Jack King." Some of the letters were received by Watson, but others were returned to "Jack King."

41. Various letters and cards mailed to Watson from Safley's mother were refused by Renz, apparently because the letter contained Safley's name or a message such as "Len sends his love."

42. Safley asked friends at the Kansas City Honor Center to write to Watson using their home addresses or post office

box. All of the letters were returned, apparently for the reason that they contained greetings from Safley.

43. Watson did not receive notification that letters to her from Safley, his mother, or his friends were being returned.

44. Safley received weekend passes at the Kansas City Honor Center. He had permission from the staff of the Kansas City Honor Center to travel to Jefferson City to visit Watson. Renz denied Safley permission to visit Watson.

45. After this litigation was filed, on the occasion of a hearing for a preliminary injunction, Safley obtained a marriage license and, being accompanied by an officiating minister, was permitted by the court to marry, thereby mooting the issue presented for hearing.[1]

Various additional factual issues will be referred to in the following section of this opinion, where pertinent to legal rulings.

### CONCLUSIONS OF LAW

*Marriage.*

■ Marriage and the decision to enter into a marital relationship involve fundamental human rights. *See Zablocki v. Redhail,* 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). Nevertheless, "the right to marry is not unfettered." *Bradbury v. Wainwright,* 718 F.2d 1538, 1540 (11th Cir.1983). While the Supreme Court has held " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,' " it has also held that "prisoners do not forfeit all constitutional protections by reason of

their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). Moreover, "[t]here must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' " *Id.* at 546, 99 S.Ct. at 1877 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)).

■ The Missouri Division of Corrections' inmate marriage rule unconstitutionally infringes upon plaintiffs' right to marriage because it is far more restrictive than is either reasonable or essential for the protection of any state security interest, or any other legitimate interest, such as rehabilitation of inmates. *See Bradbury v. Wainwright,* 718 F.2d 1538 (11th Cir.1983); *Lockert v. Faulkner,* 574 F.Supp. 606 (N.D.Ind.1983); *Salisbury v. List,* 501 F.Supp. 105 (D.Nev.1980); ABA Standard for Criminal Justice 23–8.6(a)(i) (2d ed. 1980).[2] The court disagrees with one recent decision, *Wool v. Hogan,* 505 F.Supp. 928 (D.Vt.1981). Chief Judge Sharp in *Lockert* adequately responds to the thrust of the *Wool* decision in his comments about the significance of marriage, even apart from the consortium aspects.

While marriage counseling may well be an important service provided by prison authorities, defendants have no right to have the last word on a personal decision of

---

**1.** It is generally the practice of the court to encourage informal disposition of controversies. The court took into account the fact that the individuals were temporarily in federal custody, the hearing was sought in good faith, and the marriage was in compliance with Missouri law. If the court had recognized a substantial state interest in preventing the marriage, permission would, of course, have been denied. No such interest was, or has been, presented.

**2.** The court is aware that model standards for prison administration would certainly not determine " 'the constitutional minima' ". *Rhodes v. Chapman,* 452 U.S. 337, 348 n. 13, 101 S.Ct.

2392, 2400 n. 13, 69 L.Ed.2d 59 (1981). Such standards may, however, be "helpful and relevant with respect to some questions." *Id.* It will be assumed that a responsible committee formulating standards would be sensitive to security interests, prisoner needs and legal issues. The problem with placing total reliance on the views of prison administrators would be their natural inclination to form opinions based on convenience, conceivable though remote security interests, financial considerations and the like. While giving due deference to such testimony, the court has an inescapable duty of striking a constitutional balance.

this import. Even inmates have the right to make their own mistakes.

*Correspondence.*

 The court recognizes the legitimate governmental interest in the order and security of penal institutions which "justifies the imposition of certain restraints on inmate correspondence." *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). Such restraints must meet two criteria before the censorship will be upheld:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

*Id.* at 413–14, 94 S.Ct. at 1811. *See also* ABA Standard for Criminal Justice 23–6.-1(a) (2d ed. 1980).

In the leading decision regarding the correspondence rights of prisoners the Supreme Court pointedly refrained from ruling on inmate-to-inmate correspondence. *Procunier v. Martinez*, 416 U.S. at 408, 94 S.Ct. at 1808 (1974). A slightly earlier Fifth Circuit decision sustained a federal policy prohibiting such correspondence except for "members of the immediate family" and "special exceptions" sanctioned by a caseworker. *Heft v. Carlson*, 489 F.2d 268 (5th Cir.1973).

It has been stated that the cases have "uniformly upheld the right of prison officials to restrict inmate to inmate correspon-dence." *Schlobohm v. U.S. Atty. Gen.*, 479 F.Supp. 401, 403 (M.D.Pa.1979). There is, however, no recent appellate ruling to that effect.

An Eighth Circuit decision declines to rule that there is an "unqualified right" to forbid inmate-to-inmate correspondence. *Watts v. Brewer*, 588 F.2d 646, 650 (8th Cir.1978). Only a prohibition against "secret" correspondence was sustained in *Watts*, particularly because of the danger such secret and unregulated correspondence would pose to prisoners who have been protectively isolated in another prison. A Fifth Circuit decision subsequent to *Martinez* requires careful examination of First Amendment rights of prisoners to communicate between a segregation unit and the less secure areas of a prison. *Rudolph v. Locke*, 594 F.2d 1076 (5th Cir.1979). A bare assertion of security interests is "not enough." 1077. *See also Stevens v. Ralston*, 674 F.2d 759 (8th Cir.1982) (security claims not deemed automatically controlling in justifying prohibition of correspondence between an inmate and a former prison employee).

 Defendants may attempt to distinguish *Rudolph* because it refers to certain highly protected subjects of communication ("literature about politics and religion") and because the communication was within a single institution rather than between institutions. Neither of these distinctions seems controlling. A segregated unit would be entitled to the highest degree of permissible security. The subject matter of communication rarely governs its protection. In accordance with *Rudolph*, and contrary to *Heft*, the court believes that the only valid constitutional rule would permit most inmate-to-inmate communication, with appropriate regulations as to openness (under the *Watts* rule) and surveillance. Double surveillance (reading at both institutions) would generally seem sufficient.

The court notes that defendants have allowed inmates the unrestricted use of long distance telephones, apparently without surveillance. This would seem to

present a security risk exceeding that here involved. Defendants' expert witness from Kansas, Sally Chandler Halford, acknowledged that, contrary to her views, Kansas permits inmate-to-inmate correspondence. While such communication is somewhat burdensome to the authorities, no pattern of security problems was developed by the witness or by other testimony. Forbidding *all* correspondence would reduce administrative burdens, but a First Amendment violation would result.

 Even if some restriction on inmate-to-inmate correspondence can be justified, the regulations and practices at bar must fall. The prohibitions are unnecessarily sweeping. Correspondence is a sufficiently protected right that it cannot be cut off simply because the recipient is in another prison, and the inmates cannot demonstrate special cause for the correspondence. Communication, like marriage, is one of the basic human rights and should be preserved subject to whatever restrictions or surveillance is appropriate to avoid the planning of escapes, threats to inmates, criminal activity or other potential harm that may be reasonably articulated by the authorities.

 The mail censorship regulations and practices have been applied in an arbitrary and capricious manner infringing upon the plaintiffs' First Amendment rights. The regulations and practices fail to provide for the minimum constitutional procedural safeguards against arbitrary and capricious censorship. *Procunier v. Martinez,* 418 U.S. at 417–18, 94 S.Ct. at 1814.

Defendants have failed to demonstrate that the needs of Renz are sufficiently different to justify greater censorship than is applied by other well-run institutions. *See id.* 418 U.S. at 414–18 nn. 14 & 15, 94 S.Ct. at 1811–14 nn. 14 & 15; 28 C.F.R. §§ 540.10–540.22 (1982).

The court recognizes that occasional mishandling of correspondence is inevitable, and that inmate-to-inmate correspondence may have some risks slightly exceeding that of ordinary correspondence, but concludes that the institution can effectively cope with the problems through less restrictive means, such as increased scanning of the mail of potentially troublesome inmates. *Cf. United States v. Mills,* 704 F.2d 1553, 1560 (11th Cir.1983); *Jensen v. Klecker,* 648 F.2d 1179, 1182 (8th Cir.1981); *Laaman v. Helgemoe,* 437 F.Supp. 269, 323 (D.N.H.1977).

*Visitation.*

 The court will uphold the six month visitation rule, as a matter of legitimate discretion. The rule prohibiting former inmates from visiting a prison until after they have been in a non-prison setting for six months appears to be rationally related to a proper rehabilitative interest. It does not impinge on any rights sufficiently to be ruled invalid. Inmates have no absolute constitutional right to unrestricted visitation. *See McMurry v. Phelps,* 533 F.Supp. 742, 764 (W.D.La. 1982); *Fennell v. Carlson,* 466 F.Supp. 56, 58 (W.D.Okla.1978); *Laaman v. Helgemoe,* 437 F.Supp. at 320; *Hamilton v. Saxbe,* 428 F.Supp. 1101, 1110–12 (N.D.Ga.1976), *aff'd sub nom., Hamilton v. Bell,* 551 F.2d 1056, (5th Cir.1977) (per curiam).

The evidence shows that exceptions to the rule should doubtless be made, as in the case of a former inmate who wished to help in the Alcoholics Anonymous program.[3] Where there is a significant personal relationship between a present inmate and a former inmate that is not antisocial in nature, or where visitation would not tend to delay rehabilitation of the released prisoner, exceptions to the six month rule seem desirable, but will not be mandated as a matter of constitutional law.

*Damages.*

 All of the issues presented to the court are sufficiently novel or unsettled so that a good faith defense may be recognized in the claims of plaintiff Safley and Watson against the individual defendants. *See Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).

**3.** Defendants' expert, Ellis McDougal, testified that he favored exceptions of this sort.

While there is some evidence from which a spiteful attitude could be inferred, it is sufficiently speculative so that the individual defendants should be given the benefit of the doubt. They appear to have been carrying out their concept of what was best for inmates Safley and Watson. Superintendent Turner's attitude did not evidence hostility. On the contrary it seemed excessively paternalistic.

Even if a good faith defense were not recognized in this case, the thrust of the Safley-Watson claim is for injunctive relief, and under all the facts they should be restricted to nominal damages. *Hunter v. Auger,* 672 F.2d 668, 677 (8th Cir.1982). Plaintiffs have achieved their objective, and have not been subjected to harms exceeding the violation of privacy involved in the *Hunter* case.

*Relief.*

For all of the above reasons it is hereby

ORDERED that counsel for plaintiffs and defendants confer, negotiate and prepare a suitable decree in accordance with this opinion. The joint or several proposals of the parties should be submitted to the court within thirty days of the date of this order. It is further

ORDERED that the Safley-Watson damage claims are DENIED. It is further

ORDERED that plaintiffs' counsel, having generally prevailed on the merits of this cause, promptly submit his claim for attorneys' fees and expenses. It is further

ORDERED that defendants engage in no harassment of inmates for their participation in this lawsuit.