**Alfred ZINGMOND, Plaintiff,**

v.

**Sheriff Ed HARGER and Tippecanoe County Jail, Defendants.**

No. L 83–114.

United States District Court,
N.D. Indiana,
Hammond Division at Lafayette.

Feb. 5, 1985.

Alfred Zingmond, pro se.

J. Frederick Hoffman, Lafayette, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The complaint here is filed under 42 U.S.C. § 1983.

Defendant's Motion for Summary Judgment is before the court. It was filed November 13, 1984 and is now ripe.

Alfred Samuel Zingmond has been confined in the Tippecanoe County, Indiana, jail on the following dates:

1. June 14, 1983, at 5:30 o'clock P.M. to August 26, 1983, at 12:50 o'clock P.M.

2. November 9, 1983, at 4:14 o'clock P.M. to November 21, 1983, at 10:30 o'clock P.M.

3. In both instances he was held there pursuant to an arrest warrant pending extradition to the State of Florida.

The complaint appears to involve both periods of confinement.

The claims alleged against these two defendants are stated as follows:

Allegation 1: Lack of a proper diet for a diabetic.

Allegation 2: The stopping of insulin for a diabetic and not the right medical care.

Allegation 3: Cruel and unusual punishment visiting windows. (Complaint, Paragraph D)

The only facts alleged in support of these allegations are set forth in Paragraph E of the complaint as follows:

Allegation 1: Eating the same food as other inmates. Should have diabetic diet.

Allegation 2: When asking about my insulin, I was told it was stopped. I am a diabetic. I was put in jail on June 14, 1983. Insulin was stopped July 26, 1983. After telling the doctor for 3 weeks, the jail started it again.

Allegation 3: The windows for visit were said to have been cruel and unusual punishment by the Supreme Court.

The prayer of the complaint states:

2. I believe that I am entitled to the following relief. For undue suffering and mental anguish for not getting the right diet for a diabetic and stopping of my insulin and the visiting windows in the amount of 1,000,000.

This is all that is stated in the complaint.

An extensive pretrial was held on June 29, 1984, in Lafayette, Indiana, where plaintiff testified under oath at length.

Plaintiff stated that he was held in Indiana only for extradition to Florida for parole violation. The original charge in Florida was dealing in stolen property. He had a court-appointed attorney from three days after his incarceration until he left for Florida. He never talked or wrote to Sheriff Harger. He said that he wrote twice to Lt. Chase, jail commander, once about food and once for permission for a friend to visit him and permission was granted and the friend visited him. He claims they did refuse him one visit the last time he was there which was denied by Sheriff Harger. He said he was not claiming the right to contact visits, but that the visiting window (18″ × 18″) was too small pursuant to a ruling by the Supreme Court of the United States.

He said he had been a diabetic since 1979 and took insulin twice daily. He saw the jail physician at least four times. After he was there 45–50 days, they stopped his insulin for three weeks, saying he was not a diabetic, then reinstated it. He went to the hospital twice while in the jail for blood sugar tests, but he didn't know the results of the tests. He claimed he never received a special diet, only what the other prisoners received.

The results of the two blood sugar tests run at Lafayette Home Hospital show a glucose fasting reading of 238 on June 16, 1984, two days after plaintiff was placed in the jail and one of 123 on July 20, 1984, after he had been there 35 days.

At all times involved herein, Harry E. Klepinger, M.D., a licensed physician and an active member of the staff of Lafayette Home Hospital, was jail physician at the Tippecanoe County Jail. He examined plaintiff on four occasions, June 28, August 2, August 9, and August 16, 1983, and Dr. Vermilya, who substituted for him, examined plaintiff on June 21, 1983. Having had the first blood sugar test on June 16, diabinese was prescribed for plaintiff from the time of his admission until the results of the second test were received. When Dr. Klepinger received the results of the July blood test, he stopped the diabinese and special diet because, in his opinion, the test was in the normal range and plaintiff needed no special diet. Although weekly visits were made to the jail, plaintiff only requested to be seen by the physician on the above occasions, and one of these related solely to another problem. Dr. Klepinger states that the medications prescribed to plaintiff during his confinement in the Tippecanoe County Jail were his decisions and not those of Sheriff Harger.

Dee Masterson states in her affidavit that she has been a cook at the Tippecanoe County Jail since January 1, 1973, has consulted frequently with the Home Economics Department at Purdue University con-

cerning nutritional problems of inmates there, has had years of experience with the problems and dietetic needs of diabetics because her one son has been diabetic since the age of two, has had her menus reviewed by a registered dietician and follows the guidelines recommended by the dieticians of St. Elizabeth Hospital in planning needs for diabetics. She states that following these guidelines she eliminated sweets from plaintiff's diet, substituted milk for soft drinks, and increased the amounts of fruits and vegetables served him. She was unable to restrict plaintiff's intake of food because he was in a cell block with other prisoners and he received cookies, doughnuts, etc. from fellow prisoners and purchased coca-cola, wild cherry pop, corn chips, and candy from the jail commissary as shown by Commissary Receipts. She stated that even though Dr. Klepinger stated that plaintiff could be on a regular diet after the July blood sugar test, she continued to serve him a low sugar diet.

The physician's records attached to the affidavit of Sheriff Harger reflect the above statements and show that on June 21, 1983, plaintiff was to receive diabinese twice daily and "possibly substitute something in place of doughnuts in a.m." On August 2, the blood sugar was "normal" and "try low carbohydrate diet;" on August 9, he was to be "now on same diet as others", and on August 16, he was to receive "diabinese" again.

Exhibit 7 to Sheriff Harger's affidavit shows that plaintiff received diabinese daily during the periods it was prescribed for him.

The jail rules which were in force during the time plaintiff was there are attached to Sheriff Harger's affidavit. They provide that the prisoners shall receive a nutritious and well balanced diet meeting or exceeding the federal daily allowances prescribed by law and adequate and regular medical care and states: "those inmates receiving regular medications will receive the medicine as prescribed". That these provisions were complied with is shown by the Physi-

cian's Records and the Administrative Record.

Exhibit 4 to Sheriff Harger's affidavit is a December 6, 1983 report made by the Food Services Department of Lafayette Home Hospital at the Sheriff's request concerning the food service at the Tippecanoe County Jail.

Exhibit 4 to Dee Master's affidavit is a report made after talking to two of the visitors to plaintiff, Sonny Haley and Glenda Haley, who visited him on July 9, 1983, indicating that plaintiff might not be diabetic and that he might have consumed large quantities of sugar intentionally prior to the blood sugar test of June 16, 1983. Therefore, he ordered the surprise retesting which gave what Dr. Klepinger reported to be a normal reading. Sheriff Harger shows that he attempted to comply with the dietetic requirements of diabetics and all other prisoners needing special diets for medical, religious or other reasons and has instructed his staff to so do.

## II.

In considering the constitutional issues raised in this case this court must consider the interplay of several decisions of the Supreme Court of the United States: *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (pretrial detainees); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (medical treatment under Eighth Amendment standards); and *Block v. Rutherford*, —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (visitation). Much of the judicial homework on the interplay between *Bell v. Wolfish* and *Estelle v. Gamble* has been done recently by Judge Coffey in *Matzker v. Herr*, 748 F.2d 1142 (7th Cir.1984).

Conceptionally the medical treatment issue as to pretrial detainees must be rationalized under the Due Process Clause and not directly under the Eighth Amendment. The standards are basically the same and are generally in a similar factual setting. There is one basic difference as to pretrial detainees. A showing deliberate

indifference is not required under the Due Process Clause. *See Kincaid v. Rusk,* 670 F.2d 737, 743 n. 8 (7th Cir.1982). For a pretrial detainee a jailer must promptly and reasonably procure competent medical aid for one who suffers serious illness or injury while confined.

■ The jail standards as to medical attention here are similar to the ones in *Matzker,* at 1147, and facially comply with the due process clause. Given the inferences favoring the plaintiff here under Rule 56 F.R.C.P., he has failed to show any basic denial of competent medical care. In fact, just the contrary is shown.

After the results of the July 20, 1983, blood sugar tests were known to the jail physician, the medication "diabinese" was no longer prescribed for plaintiff. At all times the medicine prescribed by the physician was given him. As shown by the affidavit of Dee Masterson, jail cook, she continued to give him a low sugar diet. The most that he could hope to prove would be negligence on the part of his jailers. Negligence will not support an action under 42 U.S.C. § 1983, or for a violation of the Eighth Amendment, *Risner v. Duckworth,* 562 F.Supp. 378, 380–382 (N.D.Ind. 1983); *Penn v. Starks,* 575 F.Supp. 1240, 1254 (N.D.Ind.1983).

■ He has not sued the jail physician who ordered his insulin stopped. The jail staff must obey and follow the orders of the jail physician in dispensing medicines. Even if the jailers failed to get his medicine to him on all occasions as prescribed, this again could be only negligence. *See Hahn v. McLey,* 737 F.2d 771 (8th Cir.1984) and *Burns v. Head Jailor of the LaSalle County Jail,* 576 F.Supp. 618 (N.D.Ill. 1984), where Judge Shadur stated as he dismissed a *pro se* complaint filed by a prisoner (576 F.Supp. 620):

> Finally Burns assails defendants' failure to provide him medicine when needed. He alleges at times defendants either ran out of medicine or were late in delivering his medicine to him. No inadvertent failure to provide adequate medical care shows deliberate indifference. See *Gib-*

*son v. McEvers,* 631 F.2d 95, 98 (C.A. 7th Cir.1980). Moreover, as with Burns' other claims for medical mistreatment, he fails to allege any harm from defendants' acts or omissions. In this Circuit resulting harm is an essential element to a claim of constitutionally inadequate medical care. *Thomas v. Pate,* 493 F.2d 151, 158 [ (7th Cir.1974) ].

As can be seen from the Commissary Receipts attached as Exhibit 3 to Dee Masterson's affidavit, plaintiff himself knowingly and intentionally violated his dietary requirements by purchasing soft drinks and candy from the Commissary. Under the Jail Rules plaintiff could not be denied access to the Commissary. According to Dee Masterson, he also got cookies, doughnuts, etc. from his fellow prisoners.

Plaintiff was not harmed or injured in any way by the medical treatment and diet he received at the Tippecanoe County Jail.

■ Even if Dr. Klepinger were responsible, Sheriff Harger and the Tippecanoe County Jail would not be responsible for the treatment or lack of treatment given plaintiff, *Eklund v. Hardiman,* 580 F.Supp. 410, 412–414 (N.D.Ill.1984). It is clear from his affidavit that Sheriff Harger has not attempted to influence the jail physician in the administering of medical care to the prisoners. His jail rules provide for such care. The jail rules comply with the standards established by the Indiana Department of Corrections. A recent and most important distinction has been drawn as to the function of independent outside physicians engaged to treat inmates. *See Calvert v. Sharp,* 748 F.2d 861 (4th Cir. 1984).

Similar is *McEachern v. Civiletti,* 502 F.Supp. 532 (N.D.Ill.1980) where summary judgment was granted in a similar case against prison administrators, Judge Aspen stating (502 F.Supp. 534:

> The Court need not decide, however, whether plaintiff's prescribed treatment was "blatantly appropriate." Gora and Luther are prison administrators, not licensed medical practitioners. Lacking

the requisite expertise, they must necessarily place their confidence in the reports of the prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper. Defendants here clearly deferred to the professional medical judgment of the doctors attending plaintiff with respect to both the propriety of his treatment and the lack of any medical necessity for making special transportation arrangements to accomplish his transfer to another correctional facility. Defendants' reliance upon the opinion of their medical staff as to the proper course of treatment for plaintiff is sufficient to insulate them from any liability under the eighth amendment. See *McCracken v. Jones,* 562 F.2d 22, 24 (10th Cir.1977).

The doctrine of respondeat superior does not apply to 1983 claims, *Pearl v. Dobbs,* 649 F.2d 608 (8th Cir.1981); *Adams v. Pate,* 445 F.2d 105, 107 (7th Cir.1971); *Boettger v. Moore,* 483 F.2d 86, 87 (9th Cir.1973); *Arroyo v. Schaefer,* 548 F.2d 47, 51 (2d Cir.1977); and *Duchesne v. Sugarman,* 566 F.2d 817, 830 (2d Cir.1977) where the court stated:

The doctrine of respondeat superior is unavailable as a basis for imposing liability under § 1983, there must be a showing of personal responsibility.

Similar are *Johnson v. Glick,* 481 F.2d 1028, 1033–1034 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Baskin v. Parker,* 602 F.2d 1205 (5th Cir.1979); and *Perry v. Elrod,* 436 F.Supp. 299, 302 (N.D.Ill.1977). *See also: Developments in the Law, Section 1983* and Federalism, 90 Harv.L.Rev. 1133, at 1207 (1977).

There must be a personal involvement of the defendant in the illegal acts before damages can be awarded under § 1983, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Mukmuk v. Commissioner of Department of Corrections,* 529 F.2d 272, 275 (2d Cir. 1976), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2238, 48 L.Ed.2d 838 (1976); and *Jennings v. Davis,* 476 F.2d 1271, 1274–1275 (8th Cir.1973) where the Court stated this principle as follows:

"The doctrine of respondeat superior has been held generally inapplicable to the section 1983 action; and most courts have been unsympathetic to the claim that higher level officers have a general duty to the public to supervise, correct or control the actions of their subordinates. Plaintiffs have thus been required to demonstrate that the supervisory defendant actually encouraged, or directed the illegal conduct of lower level officials. In effect, this has limited the instances where plaintiffs can recover primarily to situations where there has been a history of widespread abuse in the conduct of the governmental operation under the defendant supervisor's control."

Judge Fairchild stated the rule as follows in *McDonald v. State of Illinois,* 557 F.2d 596, 601–602 (7th Cir.1977):

We find the law to be clear that for plaintiff to state a cognizable claim, he must allege more than mere negligence on the part of these defendants … Indeed, in the case of supervisory officials, he must allege some personal involvement in the deprivation.

Nowhere does plaintiff allege any facts indicating that Edgar B. Harger did anything personally to deny any prescribed medicine or proper diabetic diet to plaintiff. The Sheriff denies any knowledge of his deprivations in his affidavit. Neither he nor the jail participated in the alleged deprivation.

In *Duncan v. Duckworth,* 644 F.2d 653 (7th Cir.1981) the Court of Appeals affirmed dismissal of a *pro se* claim alleging denial of medical treatment against the Warden of the Indiana State Prison saying (644 F.2d 656):

As to defendant Duckworth, the warden of the prison, there is equally no specific allegation of personal misconduct on his part.

In *Layne v. Vinzant,* 657 F.2d 468, 471 (1st Cir.1981) the Court, (including Judge

Pell by designation) in a case alleging deliberate indifference to medical needs against the prison superintendents stated:

> Because "an inadvertent failure to provide medical care" is not actionable, even if negligent ... and because there is no *respondeat superior* liability under Section 1983, ... the ultimate question is the state of mind of the defendant.

If we apply these tests here, clearly there are no disputed facts which could indicate any liability on Sheriff Harger.

For the same reason there is no liability on the part of the Tippecanoe County Jail, *Eklund v. Hardiman*, 580 F.Supp. 410 (N.D.Ill.1984). Prior to *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) there was immunity from liability under 42 U.S.C. § 1983 against municipalities. When this immunity was abolished, the Supreme Court specifically ruled that municipal liability could not be based on the improper action of its officials under this doctrine of *respondeat superior*, *Monell v. Department of Social Services*, 436 U.S. 658 at 690, 98 S.Ct. 2018 at 2035, 56 L.Ed.2d 611 (1978); *Lojuk v. Quandt*, 706 F.2d 1456, 1468 (7th Cir.1983); *Lenard v. Argento*, 699 F.2d 874, 885–886 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983).

■ Although *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) held that municipalities may not assert a good faith defense of its official or agents as a defense to its liability, such liability still must be formed on the official policy of the governmental unit, 445 U.S. at 657, 100 S.Ct. at 1419. Therefore, there can be no municipal liability and no liability against the Tippecanoe County Jail which is part of Tippecanoe County, unless there is some governmental act, omission or policy that violates the duty of the County Jail directly to plaintiff. Since there is no official government policy which is involved in these alleged constitutional deprivations, there is no liability on the Jail as an entity, *Crowder v. Lash*, 687 F.2d 996, 1005–1006 (7th Cir.1982).

III.

Nothing is alleged in the complaint about the normal jail diet, which plaintiff was on for a period commencing July 26, 1983 and ending August 16, 1983, pursuant to orders of Dr. Klepinger, he did not complain about it at the pretrial. Dee Masterson states in her affidavit that during this period she still gave plaintiff a low sugar diet by substituting fruit for sweets, and milk for soft drinks. Therefore, he was not served the doughnuts he complains of. He apparently received them from his fellow inmates. He does list other items of a typical menu.

In 1979 Mrs. Masterson had Melissa Kollenkark, Registered Dietitian, review her menus. Her report affidavit found the meals nutritionally adequate.

Recently Sheriff Harger requested review of the menus by a registered dietitian of Lafayette Home Hospital. Her report, which is attached as Exhibit 4 to the affidavit of Sheriff Harger found the meals to be adequate, although she suggested changes which have now been made.

The affidavit of Dee Masterson shows that she is experienced in food preparation, has taken additional schooling to improve her ability to provide a proper diet and is striving to serve a balanced diet, within the constraint of the funds available for food.

The jail rules promulgated by Sheriff Harger and approved by the Judge of the Tippecanoe Circuit Court state:

> Inmate rights, include, but are not necessarily limited to nutritious and well balanced diet, meeting or exceeding the federal daily allowances as prescribed by law.

The reports of Melissa Kollenkark, R.D., and Wanda Childress-McVeigh, M.S., R.D., show that this standard is being met.

■ Did the meals served plaintiff during this three week period amount to punishment? Clearly the answer is "no". The food was nutritious. It varied. There

was meat daily. Milk was available at two meals. He was given extra fruit.

Much of the food was plain. The Sheriff had only 85 cents per meal or $2.25 per day to serve three meals to a prisoner. You can't serve steak, or lamb chops on that money. However, fancy food is not required—only that it be nutritious, well balanced and in adequate quantities.

In *Boston v. Stanton,* 450 F.Supp. 1049 (W.D.Mo.1978) the Court dismissed a complaint as not stating a claim, which alleged:

> that breakfast ... was unpalatable. Hot food was allegedly cold, cold food warm. Jelly packages were submerged in oatmeal and bread was soaked with coffee. Salt was allegedly placed in oatmeal (450 F.Supp. 1054), and

> "that jail officials placed plaintiff on a diet of sandwiches and lunch meat and cheese after the food throwing incident." (450 F.Supp. 1055).

The Court stated (450 F.Supp. 1055).

> It is settled that allegations concerning denial of hot meals do not state a cognizable claim, if prisoners are adequately fed. *Hoitt v. Vitek,* 497 F.(2d) 598 (1st Cir.1974).

Further an occasional incident of a foreign object discovered in prison food raises no constitutional issue, *Lunsford v. Reynolds,* 376 F.Supp. 526 (W.D.Va.1974), nor does the occasional presence of roaches and hair in the food. *Kennibrew v. Russell,* 578 F.Supp. 164, 168 (E.D.Tenn.1983).

The food served plaintiff in the Tippecanoe County jail certainly was better than that referred to in *Boston v. Stanton,* 450 F.Supp. 1049.

■ The standard for the maintenance of county jails promulgated by the State of Indiana are set forth in full as Exhibit 5 to the affidavit of Edgar B. Harger (Exhibit A to Motion). Section 12 (210 IAC 3–1–12) applies to Diet and Food preparation. It states:

> Sec. 12. Diet and Food Preparation.
> (a) Each sheriff shall establish written policies and procedures concerning the quantity and quality of food served to inmates.

> (b) Food shall not be used as a reward or withheld as a disciplinary measure. All meals shall be served under the supervision of the jail administrator or his designee. There shall be no more than fourteen (14) hours between the evening meal and breakfast. Inmates shall be served three (3) meals each day. One meal each day shall be served hot.

> .    .    .    .    .

> (e) Medical diets approved by the responsible physician shall be honored. Religious diets shall be honored to the extent that the required food is readily accessible in the community where the jail is located. Any refusal to grant a medical or religious diet shall be reported in writing to the sheriff or jail administrator.

> (f) Each sheriff shall establish in writing a control system to monitor and control food pilferage, misuse or spoilage.

The jail rules established by Sheriff Harger and the food served by Dee Masterson certainly meet all requirements of these standards.

### IV.

■ The third allegation of plaintiff's complaint is that the windows for visitation constituted cruel and unusual punishment under decisions of the Supreme Court. He repeated these charges at his pretrial. He admitted that he had a number of visitors, both friends and relatives. This is shown by the Visitor's Records of the Jail. Although he says one prospective visitor told his attorney he was not allowed to visit during his November incarceration, which the Sheriff denies (Paragraph 24 of Ex. A) he states he had two others during that period. Obviously, if such occurred, it was without the knowledge of these defendants and contrary to the jail rules. Therefore, there would be no liability on them for such isolated denial if it in fact occurred. *Greene v. United States,* 589 F.Supp. 834, 836 (N.D.Ga.1984).

*Block v. Rutherford,* — U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) is the most recent relevant authority here.

It is clear that the *Bell v. Wolfish* test of whether the conditions constitute punishment applies, *Ramos v. Lamm,* 639 F.2d 559, 579 (10th Cir.1980). The standard set forth in *Duran v. Elrod,* 542 F.2d 998, 1000 (7th Cir.1976) is no longer the law in this circuit. In *Ramos v. Lamm,* 639 F.2d 559, 581 (10th Cir.1980), the Court of Appeals for the Tenth Circuit upheld a complete ban on visitation by non-relatives where the prisoner had relatives who visited him. Here Lt. Chase permitted non-relatives to visit plaintiff although he had relatives who could and did visit him.

In *Jackson v. Illinois Department of Corrections,* 576 F.Supp. 1368 (N.D.Ill. 1983) Judge Shadur granted summary judgment in a case where plaintiff had his visiting rights terminated as to a particular visitor because of rule violations connected with the prior visit. In *Safley v. Turner,* 586 F.Supp. 589 (W.D.Mo.1984) a rule prohibiting visits from former fellow inmates for a period of six months after they left prison was upheld. In *Block v. Rutherford,* — U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) the Supreme Court again upheld the test established in *Bell v. Wolfish* of whether the jail condition, practice or policy constitutes punishment of the pretrial detainee (104 S.Ct. 3231). It went on to hold that it was proper to deny contact visits with pretrial detainees at the Los Angeles County Jail, 104 S.Ct. 3232–3234, for security reasons. The same rationale applies in this case. Where you have a jail containing 50 prisoners, you must have a secure method for visitation where the prisoners are secure, the jail employees are secure, the visitors are secure and contraband cannot be passed from visitor to prisoner. One way to do this is to have a wall separating the prisoner with a window and grid through which the prisoner and visitor can communicate while viewing each other. This is the way the Tippecanoe County Jail is constructed. Plaintiff says the windows are only a foot and half by a foot and a half. Certainly that is large enough for prisoner and visitor to view each other. He does not deny that he had a number of visitors, on at least five separate dates, and often two on each date. Apparently the visits were satisfactory as the only complaint is the size of the visiting window. The strong language of Chief Justice Burger that "we have emphasized that we are unwilling to substitute our judgment on these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities" (104 S.Ct. 3233) are clearly relevant here.

There has been full compliance with *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir.1982). The defendants are entitled to summary judgment on all issues here presented. SO ORDERED.