**Willie WILLIAMS, Plaintiff,**

v.

**John CEARLOCK, et al., Defendants.**

**No. 96–3003.**

United States District Court,
C.D. Illinois,
Springfield Division.

Feb. 10, 1998.

---

Willie Troy Williams, Sheridan, IL, pro se.

Brian J. Dees, Springfield, IL, Elizabeth Miller, Pittsfield, IL, for Defendants.

## OPINION

RICHARD MILLS, District Judge.

Willie Williams—a state prisoner—has brought this civil rights action pursuant to 42 U.S.C. § 1983.

He claims that the defendants—correctional officials and health care providers at the Graham Correctional Center—violated the plaintiff's constitutional rights by acting with deliberate indifference to his medical needs.

More specifically, he alleges that "systematic deficiencies" in the prison's medical procedures frequently resulted in his going without his prescribed medication; that nurses sometimes dispensed medication at the wrong hour, thereby jeopardizing his health and comfort; and that one nurse refused to take the plaintiff his medicine when she learned that he had been transferred to another unit.

The defendants' motions for summary judgment are allowed.

## STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the nonmoving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig, v. Sears, Roebuck & Co.,* 864 F.2d 1359 (7th Cir.1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507–08 (7th Cir.1992).

### FACTS

The plaintiff is a state prisoner, confined at the Graham Correctional Center at all times relevant to this action. [The plaintiff is currently incarcerated at the Sheridan Correctional Center.] The defendants Kenneth Dobucki and Bradley Sassatelli are, respectively, the prison's warden and assistant warden. The defendant John Cearlock is the health care unit administrator at Graham. The defendants Patti White and Susan Schroll (now Linden) are staff nurses, or were so at the time of the events giving rise to this lawsuit.

The following facts are undisputed for purposes of this motion: The plaintiff suffers from chronic hypertension (high blood pressure). The plaintiff must take medication such as Calan SR, Zestril, and Lotensin; furthermore, his blood pressure must be monitored regularly.

The plaintiff has also been diagnosed with psychosis NOS [presumably, "not otherwise specified" as a particular type of mental illness] and depression, for which he has taken (at various times) Sinequan, Vistaril and Atrex. In addition, the plaintiff received ongoing care from a psychiatrist and psychologist while confined at the Graham Correctional Center.

On occasion, the plaintiff refused both his psychiatric medication and his blood pressure medication.

In "rare instances" the plaintiff did not receive his prescribed medication. Reasons included oversight or miscommunication, a prescription not being renewed, or the pharmacy awaiting delivery of medication not in stock. A physician orders medication for a specific length of time. When a medication order expires, it must be re-ordered by a doctor, as only licensed physicians can prescribe medication.

On each occasion when the plaintiff called an omission to the health care staff, the reason for the lapse was explained to him. If the problem stemmed from a failure on the part of the prison health care staff, efforts were made to ensure that the problem not recur. *See* Affidavit of John Cearlock, Health Care Unit Administrator. On other occasions, the plaintiff failed to alert anyone that he had not received his medication.

According to Dr. Vipin Shah, who was one of the plaintiff's treating physicians at Graham, "Missing a couple of days of [psychotropic] medication will not cause any serious problem in the management of [the plaintiff's psychological] conditions. From psychiatric notes in the medical chart, it appears that the plaintiff was stable throughout the period covered by the amended complaint."

Likewise, while chronic high blood pressure can pose serious risks, the condition is "easily managed" through medication and diet. Shah affidavit. Because high blood pressure treatment is "long-term therapy," occasionally missing medication by the dose, or even for an entire day, would not normally cause distress to the patient. *See* Shah, Cearlock affidavits. Blood pressure can become elevated due to nervousness, anxiety, or eating too much salty food. At no time did the plaintiff have such elevated blood pressure as to call his health or safety into question. *Id.*

When the plaintiff was in segregation, his morning medications were delivered by nurses around 4:30 a.m., with breakfast, rather than at 8:00 a.m. (when pill bottles evidently indicated the medication should be taken). Shah states in his affidavit that the medications the plaintiff takes "should be given with food and, for that reason, it was very appropriate to give the medicine with breakfast as early as 4:30 a.m., rather than waiting until 8:00 a.m.... [T]here is no danger or problem whatsoever delivering morning medicines with breakfast prior to 8:00 a.m." *See also* White affidavit. Furthermore, since the blood pressure medication was taken once a day, it did not matter what time of day it was taken. *Id.*

In September of 1994, the plaintiff was counseled about the importance of taking his medication. The plaintiff was put on "unit doses" to ensure his compliance. The plaintiff reported no complaints about his blood pressure in September, October, November or December of 1994, nor in January, February, or March of 1995.

On October 29, 1995, the plaintiff told officials that he had collapsed in his cell. The nurse who examined the plaintiff observed no sign of injury other than minor nose bleeding. The bleeding was stopped with "first aid management" (simply applying pressure to the lower septum). The plaintiff's blood pressure at the time, 160 over 100, was "borderline high," but not serious. By that evening, the plaintiff's blood pressure had improved. The plaintiff had been receiving his blood pressure medication as scheduled prior to the episode.

A hypertension exam scheduled for November 8, 1995, was postponed until November 11, 1995, due to a large number of inmates needing attention.

The physician who was scheduled to conduct the hypertension clinic on November 11, 1995, was in an automobile accident and was therefore unable to get to the prison. As a result, the plaintiff's prescription for blood pressure medication expired on that date.

On the mornings of November 12 and 13, 1995, the plaintiff did not receive his blood pressure medication because the orders had expired. The health care staff advised the plaintiff about the doctor's accident. The plaintiff reported no problems when a nurse saw him on "sick call" on November 12, 1995.

A physician examined the plaintiff and renewed his medication on November 13, 1995.

The same day, the plaintiff told a nurse that he had "blacked out" and hit his head on a table. The nurse's examination revealed no abrasions, contusions, or ecchymosis (discoloration) where the plaintiff claimed to have hit his head. The nurse noted no acute distress. The plaintiff's gait was steady. His blood pressure was just "a little high."

A physician examined the plaintiff the next day. The doctor's examination revealed no significant injury. The doctor noted that the plaintiff was "alert and coherent," and that there was no swelling or nodule at his temple. The plaintiff's blood pressure was "O.K." The doctor concluded that the plaintiff was exaggerating his complaints.

Thenceforth, the plaintiff continued to complain of headaches, but "no objective findings" substantiated a head injury. *See* affidavit of Patti White. A skull x-ray on November 27, 1995, was negative.

On December 8, 1995, the plaintiff claimed to have again fallen in his cell. An examination revealed a small contusion to the plaintiff's left eyebrow and a nose bleed, neither of which was "significant." The plaintiff was counseled about orthostatic hypotension and instructed to rise slowly. The plaintiff had received his blood pressure medication as scheduled prior to the episode.

Blood pressure readings during the time period of each injury were "borderline," according to Dr. Vipin Shah, and would not likely have caused the plaintiff to black out. Shah further suggests that the plaintiff may have "manipulated" his blood pressure. The plaintiff was seen by nurses at "sick call," by doctors, and by his psychiatrist during the entire relevant time period and voiced no complaints about not receiving his medication.

On December 20, 1995, the defendant Schroll was assigned to dispense medication in the segregation wing. Prior to going to the gallery, Schroll contacted the defendant Davis, the segregation officer, to obtain a list of inmates in segregation that day. Schroll either misunderstood Davis or he misstated that the plaintiff had been transferred when, in fact, the plaintiff had merely been moved to another cell within the segregation unit. Schroll did not investigate the matter further since the plaintiff's name was not on her list, and because the plaintiff had previously told her that he was scheduled to be transferred.

Schroll passed by the plaintiff's cell twice, but he did not notify her that he was there and awaiting his medication.

The plaintiff filed a grievance [1] regarding the incident. The health care staff held a

---

1. Throughout the time period in question, the plaintiff filed numerous grievances and wrote numerous letters concerning his medical care.

special meeting to implement procedures to ensure that the plaintiff and other inmates in segregation received effective medical care. [Cearlock reports that the staff was aware of the plaintiff's litigious propensities and made extra efforts to appease him.]

On February 2, 1995, one of the plaintiff's treating physicians at Graham (Jones, not a defendant) recommended a CAT scan due to the plaintiff's persistent complaints of headaches. The prison's medical insurer denied the procedure, finding that the plaintiff's exams and x-rays did not indicate that a CAT scan was necessary. The defendants had no input in that decision.

The American Correctional Association conducts on-site inspections of the Graham Correctional Center every three years. The overall inspection includes review of the prison's health care unit. Graham received accreditation from the A.C.A. in January 1992 and January 1995.

In addition to the A.C.A., the Joint Commission for the Accreditation of Health Care Organizations conducts inspections and audits of the prison health care unit. The J.C.A.H.O. accredited the Graham Health Care Unit in June of 1992 and June of 1995. The most recent accreditation was "with commendation," the highest accreditation level given by the J.C.A.H.O.

From July 22, 1994, through November 5, 1996, the plaintiff was seen by a nurse at least once each day and often by a doctor or doctors. His blood pressure was regularly checked, and he had a hypertension examination approximately four times a year. Health care personnel visit the prison's segregation unit on a daily basis.

### DISCUSSION

No material facts are in dispute, and the court finds that the defendants are entitled to judgment as a matter of law. Even viewing the record in the light most favorable to the plaintiff, no reasonable person could find either that the defendants acted with deliberate indifference to the plaintiff's serious medical needs, or that the medical system at

Graham failed to meet minimal standards of adequacy.

█ In order for a prison inmate to prevail under 42 U.S.C. § 1983 on a claim of medical mistreatment, he must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard of deliberate indifference was recently reaffirmed in *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("[S]ociety does not expect that prisoners will have unqualified access to health care"); *see also Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The indifference to medical needs must be substantial; inadequate treatment due to negligence, inadvertence or differences in judgment between an inmate and medical personnel do not rise to the level of constitutional violations. *Estelle; Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991) (if the claim is merely medical malpractice, it should be brought in state court). Deliberate indifference may be demonstrated by actual intent or by reckless disregard. *See Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir.1990).

█ Under the circumstances of this case, occasional missed doses of medication do not implicate the Constitution. [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute a "wanton infliction of unnecessary pain" or to be repugnant to the conscience of mankind. *Estelle,* 429 U.S. at 106. In order to rise to the level of a constitutional violation, a defendant's actions must reflect a degree of wantonness tantamount to knowing willingness that the plaintiff will be harmed by the defendant's conduct. *Duckworth v. Franzen,* 780 F.2d 645, 654 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986) (failure-to-protect case).

Here, the plaintiff's allegations do not approach the threshold of the Eighth Amendment's standard of deliberate indifference.

The record is replete with responses from the health care unit attempting to assure the plaintiff

that his medical needs were being met.

While the defendants admit to the occasional mistake, the record reflects that the plaintiff received comprehensive, ongoing care while incarcerated at the Graham Correctional Center. He was seen by health care staff on a daily basis, he received medication and counseling, he underwent diagnostic tests, and the medical staff responded to his numerous letters questioning the propriety of his medical treatment.

The defendants' failure to provide the plaintiff with his medicine on occasion amounted, at worst, to negligence. *See Zingmond v. Harger,* 602 F.Supp. 256, 260 (N.D.Ill.1985); *Burns v. Head Jailor of La-Salle County Jail,* 576 F.Supp. 618 (N.D.Ill. 1984). Negligence, gross negligence, or even recklessness as used in the civil tort sense, are insufficient to support an Eighth Amendment claim. *Duckworth, supra,* 780 F.2d at 653. Excusable delays in properly treating an inmate that do not stem from deliberate indifference do not implicate the Eighth Amendment. *Shockley v. Jones,* 823 F.2d 1068, 1072 (7th Cir.1987).

The court is particularly unwilling to find a constitutional violation since the plaintiff suffered no real harm, and since he has failed to establish that the minor injuries he did suffer can be attributed to the lack of medication. [To the contrary, the record raises a strong inference that this lawsuit was entirely concocted.] Indeed, the plaintiff himself deemed his medication to be sufficiently unimportant that he sometimes declined to take it. The plaintiff has failed to establish a triable issue as to whether the defendants deliberately withheld needed medication or care.

The defendants are likewise entitled to judgment as a matter of law on the plaintiff's general challenge to the provision of medical care at the Graham Correctional Center. State prisons, of course, are obliged to provide inmates in their custody with a medical care system that meets minimum standards of adequacy. *Wellman v. Faulkner,* 715 F.2d 269, 271 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). The plaintiff, borrowing language from the pertinent case law, alleges that there were "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff;" however, the record does not support his contention that there are "such systematic and gross deficiencies in the staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman,* 715 F.2d at 272. The prison—and specifically the health care unit—have been accredited by independent bodies in the very field of institutional medical care. The accreditation was in effect during the time period the plaintiff was incarcerated at Graham, and his voluminous medical records reflect ample, and constitutionally adequate, medical care. The record fails to support an inference that the prison's health care system was so deficient as to violate the Eighth Amendment.

■ In any case, even assuming (without finding) that the health care staff provided substandard care, the plaintiff has shown no basis for assessing liability against the defendants Dobucki or Sassatelli. The doctrine of *respondeat superior* (supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). Prison administrators, having no medical expertise, must rely on health care professionals to assess the needs of prisoners and initiate treatment. *McEachern v. Civiletti,* 502 F.Supp. 532, 534 (N.D.Ill.1980); *see also Eklund v. Hardiman,* 580 F.Supp. 410, 412 (N.D.Ill.1984). The extent of involvement of the warden and assistant warden was to refer the plaintiff's myriad complaints to the proper official in the health care unit for resolution. Because the plaintiff was being treated by medical personnel, Dobucki and Sassatelli are insulated from any Eighth Amendment claim.

■ Furthermore, the amended complaint is moot insofar as the plaintiff seeks injunctive relief. When a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred [back to the original prison]. *Higgason v. Farley,* 83 F.3d 807, 811 (7th Cir.1996) (internal citations and quotations omitted). Allegations of a likely retransfer may not be based on mere speculation. *Id.; see also Young v. Lane,* 922 F.2d 370 (7th Cir.1991). The plaintiff has failed to demon-

strate that he has standing to obtain injunctive relief.

The plaintiff has not contested the defendant Davis' motion for summary judgment. Davis, a correctional officer, asserts that he "had no responsibility to dispense any medication to the Plaintiff and in no way had any responsibility either direct or indirect for the administration of medication to the Plaintiff." Davis' possible misinformation to the defendant Schroll that the plaintiff had been transferred cannot fairly be attributed to deliberate indifference. Davis' unopposed motion for summary judgment will be granted.

In fact, the plaintiff's entire "response" to the summary judgment motion is simply a rehash of his myriad discovery motions. The plaintiff continues to argue that the defendants have withheld important discovery materials, principally results of investigations of his grievances. The court already considered and rejected the plaintiff's various complaints about alleged misconduct on the part of the defendants and defense counsel. Regardless, the court finds that the investigation results are immaterial. Even if health care professionals were at fault on certain occasions when the plaintiff did not receive his medication, the court remains persuaded that the incidents did not reflect deliberate indifference to a serious medical need. The court has also already ruled that the defendants were permitted to withdraw their default admissions. *See* Order of April 8, 1997. The court will not continue to revisit those discovery disputes.

In sum, no material facts are in dispute, and the court, for the reasons discussed in the preceding paragraphs, concludes that the defendants are entitled to judgment as a matter of law. The record in no way supports a finding that the defendants acted with deliberate indifference to the plaintiff's serious medical needs.

IT IS THEREFORE ORDERED that the defendant Davis' uncontested motion for summary judgment is allowed.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment is allowed. The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed.R.Civ.P. 56.

The case is terminated. The parties are to bear their own costs.