Leonard SAFLEY, et al., Appellees,

v.

William R. TURNER; Kathy Crocker; Earl Engelbrecht; Betty Bowen; Bernice E. Trickey; Howard Wilkins; James Purkett; William F. Yeager; Larry Trickey, Appellants.

Leonard SAFLEY, et al., Appellees,

v.

David W. BLACKWELL; Lee Roy Black; Donald Wyrick; Betty Bowen; Earl Engelbrecht, Appellants.

Nos. 84–1827, 84–2337.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1985.

Decided Nov. 19, 1985.

Henry Herschel, Columbia, Mo., for appellants.

Cecelia G. Baty, Kansas City, Mo., for appellees.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and NICHOL,* Senior District Judge.

* The HONORABLE FRED J. NICHOL, Senior United States District Judge for the District of South Dakota, sitting by designation.

NICHOL, Senior District Judge.

This is an appeal from a class action in which the district court [1] declared unconstitutional certain regulations of the Missouri prison system. For reversal, appellants argue that the district court applied the incorrect legal standard in determining the constitutionality of the prison rules, and that the district court's findings of fact were clearly erroneous. For the reasons set forth below, we affirm.

## BACKGROUND

The challenged regulations were in effect at all institutions within the Missouri Division of Corrections. However, the focus of inquiry at trial was the Renz Correctional Institution (Renz). Renz was originally designed as a minimum security prison farm employing male inmate labor. As such, it has a minimum security perimeter without the usual maximum security elements such as guard towers and walls. Since the late 1970s, Renz has become what is known as a "complex prison"—that is, its population consists of both male and female inmates and inmates of varying security levels. Most of the female inmates at Renz are medium and maximum security level offenders, while most of the male inmates are classified as minimum security.

Two regulations are at issue in this appeal. The first dealt with mail between inmates in different institutions within the state, and was set out in Division of Corrections regulation 20–118.010(1)(e):

Correspondence with immediate family members who are inmates in other correctional institutions will be permitted. Such correspondence may be permitted between non-family members if the classification/treatment team of each inmate deems it in the best interest of the parties involved. Correspondence between inmates in all division institutions will be permitted concerning legal matters.

The challenged portion of the rule was that part permitting mail between non-family members only at the discretion of the classification/treatment team of each inmate involved.[2] The team used psychological reports, conduct violations, and progress reports contained in each inmate's file to decide whether to permit correspondence. The testimony indicated that these materials were not actually consulted on each occasion since the team was familiar with the classification files of most of the inmates. Thus, inmate-to-inmate correspondence was controlled by prior approval or disapproval of particular inmates rather than individual review of each piece of mail.

The district court found in Finding of Fact number 5 that

[t]here have been instances where the divisional correspondence regulation has been violated. For example:

a. Letters have been stopped without notice or explanation to either the correspondent or the recipient;[3]

b. Mail to and from persons not incarcerated has been stopped or refused on factually incorrect grounds or without legitimate justification;[4]

c. Mail to incarcerated family members has been refused or returned without notification or explanation;[5]

---

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

2. At Renz, this team consisted of three persons—a caseworker, Betty Bowen; a classification assistant, Warren Karander; and the particular inmate in question. Each member of the team had an equal vote. Tr., Vol. I at 87–89.

3. Division of Corrections regulations 20–118.-010(1)(C) and (2)(C) provide for notification to the sender and addressee when mail containing contraband is confiscated.

4. The regulation places no restrictions on mail to and from non-inmates except for the prohibition against contraband, escape plots, and the like.

5. Regulation 20–118.010(1)(E) provides that inmate correspondence with incarcerated family members "will be permitted." Presumably, the prohibition against contraband and the provisions for notice of confiscation apply to family as well as non-family mail.

d. Mail with former inmates has been refused or returned without notification or explanation.[6]

*Safley v. Turner,* 586 F.Supp. 589, 591 (W.D.Mo.1984). Moreover, "the rule as practiced [at Renz] is that inmates may not write non-family inmates." *Id.* This practice was set forth in the Renz Inmate Orientation Booklet presented to each inmate upon arrival at Renz. The district court found that correspondence had been denied between married inmates, and between inmates who desired to maintain a friendship. An unwritten rule at Renz required prior approval of inmate-to-inmate legal mail; absent such approval, this mail was routinely opened, stopped and refused despite the divisional regulation stating that such mail "will be permitted." The reasons given for these practices include interception of plans for escape, heading off riots and other disturbances, and controlling the formation and activities of inmate gangs. These matters are of special concern at Renz because of the minimum security perimeter.

The second rule at issue in this appeal involved inmate marriages. Prior to December of 1983, the Missouri prison system operated under divisional regulation 20–117.050, which set out the procedure to be followed when an inmate wished to marry. As the district court noted, this regulation "(a) did not obligate the Missouri Division of Correction to assist an inmate who wanted to get married, but (b) did not authorize the superintendents of the various institutions to prohibit inmates from getting married. Inmates at Renz were, however, frequently denied permission to be married." *Safley,* 586 F.Supp. at 592. On December 1, 1983, after this lawsuit was filed, a new inmate marriage regulation was promulgated providing that "[t]he superintendent may approve the marriage of an inmate when requested when there are compelling reasons to do so." Appellants' Brief, App. E. The burden was on the inmate to provide a compelling reason for the marriage. The term "compelling" was not defined in the regulation. At trial, however, testimony of prison officials indicated that only a pregnancy or the birth of an illegitimate child would be considered compelling reasons.

The district court found that the marriage restrictions were imposed largely on female inmates at Renz and at the Chillicothe Correctional Center for Women, and that the restrictions were motivated primarily by protective attitudes. Apparently many of the female inmates who were denied permission to marry had come from situations involving domestic abuse. Renz's Superintendent Turner believed "that women prisoners whose crimes were connected to abuse that they had suffered ... needed to concentrate on developing skills of self-reliance." Appellants' Brief at 30. Turner believed it to be in the best rehabilitative interests of the inmates to avoid any personal relationship with another inmate. Security interests were also cited. Appellants contend that "the friction that is caused as a result of a 'love triangle' and the maintenance of 'wholesome' inmate friendships is the basis for a large amount of violence within the prison system." *Id.* at 47–48.

The district court, relying on *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), applied a traditional strict scrutiny standard. The court held the marriage rule to be an unconstitutional infringement upon the fundamental right to marry because it was far more restrictive than was either reasonable or essential for the protection of the state's interests in security and rehabilitation. *Safley,* 586 F.Supp. at 594. Likewise, the mail rule was unnecessarily broad, thus constituting a violation of the inmates' First Amendment rights. *Id.* at 596. The district court also held that the correspondence regulations had been applied in an arbitrary and capricious manner.

### THE CORRESPONDENCE RULE

Appellants argue that, because of the plaintiffs' status as prisoners, the district court should have applied a rational basis

---

**6.** *See* note 3, *supra.*

or reasonableness test rather than strict scrutiny in determining the constitutionality of the restriction on inmate-to-inmate correspondence. The issue is one of first impression in this circuit; in fact, we have found only one other decision addressing the precise question of mail between inmates of different institutions. *See Schlobohm v. U.S. Attorney General*, 479 F.Supp. 401 (M.D.Pa.1979) (applying strict scrutiny and finding the regulation constitutional). A series of Supreme Court cases, however, as well as a number of our own past decisions concerning First Amendment rights of prisoners may provide guidance.

We begin with the observation that, traditionally, a direct governmental prohibition of the right to free speech is permissible only if the restriction furthers a compelling governmental interest and is the least restrictive alternative for achieving that purpose. *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Restrictions on the First Amendment rights of prisoners, however, have presented special problems. "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Martinez*, 416 U.S. at 405, 94 S.Ct. at 1807. Yet the duty of the federal courts to protect fundamental constitutional guarantees, even in state penal institutions, remains intact. *Id.* Hence, courts have struggled to discern the faint line between appropriate deference to prison administrators, on the one hand, and discharge of the judicial duty, on the other.

In *Martinez*, the Supreme Court considered a prisoner mail censorship regulation which proscribed certain forms of expression in inmate correspondence.[7] The Court determined that, because the regulation applied to mail to and from non-in-mates as well as inmates, the case did not require an assessment of the extent to which prisoners may claim First Amendment freedoms but instead could be decided on the basis of incidental restrictions on the rights of members of the general public. *Martinez*, 416 U.S. at 408–09, 94 S.Ct. at 1808–09. In this light, the Court held that censorship of prisoner mail is justified only if it furthers an important or substantial governmental interest unrelated to the suppression of expression, and the limitation is no greater than necessary or essential to protect that interest. *Id.* at 412, 94 S.Ct. at 1810. Under this standard, the regulation in *Martinez* was unconstitutional.

Later in the same Term the Court decided *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), which involved, *inter alia*, a challenge to a prohibition against face-to-face visits between prisoners and news reporters. Because the rule restricted only one manner of communication between inmates and the general public, *id.* at 823, 94 S.Ct. at 2804, it was regarded as a "time, place or manner" regulation. *Id.* at 826, 94 S.Ct. at 2806; *see, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The regulation was upheld because it met the traditional "time, place or manner" test. It furthered the important governmental interests in deterrence, security and rehabilitation; it was content-neutral in that it was applied equally to all reporters and prisoners; and, most significantly, several alternative means of communicating with the public, including with reporters, were available to the prisoners. *Pell*, 417 U.S. at 824–25, 94 S.Ct. at 2805.

■ In the case at bar, we do not deal with a "time, place or manner" regulation. The challenged mail rule, both on its face and as applied, purports to eliminate all manner of correspondence between inmates not "approved" by the classifi-

---

7. Inmates could not write letters in which they "unduly complain," "magnify grievances," or express "inflammatory political, racial, religious or other views or beliefs," nor could they send or receive letters that "pertain to criminal activi-ty; are lewd, obscene, or defamatory; contain foreign matter, or are otherwise inappropriate." *Martinez*, 416 U.S. at 399–400, 94 S.Ct. at 1804–1805.

cation/treatment team. Nevertheless, *Martinez* and *Pell* are useful illustrations of the proposition that, although lawful incarceration " 'brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system,' ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penalogical objectives of the corrections system." *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804 (citations omitted); *see also Martinez*, 416 U.S. at 422, 94 S.Ct. at 1815 (Marshall, J., concurring). Implicitly, then, those rights which are not inconsistent with the fact of incarceration or with legitimate penalogical objectives retain the highest level of protection afforded by the First Amendment, and their deprivation requires strict scrutiny by the courts. Thus, we must decide whether the right to exchange letters between inmates of different institutions is inconsistent with either of those considerations.

Appellants rely most heavily on two of the Court's more recent decisions. In *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), prison regulations prohibited inmates from soliciting other inmates to join the Union, barred all meetings of the Union, and prevented the delivery of packets of Union publications that had been mailed in bulk to several inmates for redistribution among other prisoners. The Court upheld the regulations because they were "reasonable, and [were] consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution." *Id.* at 130, 97 S.Ct. at 2540. However, the Court made clear that First Amendment free speech rights were "barely implicated." *Id.* The only real loss was that of the cost advantages of bulk mailings; individual mailings of Union material were not banned. *Id.* at 130 n. 8, 97 S.Ct. at 2540 n. 8.

First Amendment associational rights, the *Jones* court acknowledged, were more directly implicated but were still subject to a reasonableness standard. *Id.* at 132, 97 S.Ct. at 2541. This was a reflection of the Court's concern with the special dangers inherent in concerted group activity by prisoners.[8] The Court noted the "ever-present potential for violent confrontation and conflagration" among inmates, and the fact that "a prisoners' union, where the focus is on the presentation of grievances to, and encouragement of adversary relations with, institution officials surely would rank high on anyone's list of potential trouble spots." *Id.* at 132–33, 97 S.Ct. at 2541.

■ Unlike in *Jones*, First Amendment speech rights are directly implicated in the instant case. The right to exchange letters with another is clearly a fundamental free speech value. And the presumption of dangerousness applied by the *Jones* Court to prisoner unions loses its force in the context of mail between two inmates in two different institutions physically separated by many miles.

The other case relied upon by appellants is *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). There, a group of pretrial detainees contended, *inter alia*, that a regulation prohibiting the receipt of hardback books not mailed directly from publishers, book clubs, or bookstores violated the First Amendment. The receipt of paperback books, magazines, and other soft-covered materials from any source was permitted. The Court upheld the regulation, concluding it was a rational response to an obvious security problem. *Id.* at 550, 99 S.Ct. at 1880. "It hardly needs to be emphasized that hardback books are especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings." *Id.* at 551, 99 S.Ct. at 1880. There was no evidence that prison officials had exaggerated their response to this security problem. *Id.*

---

**8.** For a thorough discussion of *Jones* and other decisions pertinent to this issue, *see Abdul Wali* *v. Coughlin*, 754 F.2d 1015, 1029–33 (2d Cir. 1985).

In addition to finding the rule reasonable, the Court in *Wolfish* took an approach similar to the one in *Pell, supra,* regarding the rule as a "time, place, or manner" regulation. *Id.* at 553, 99 S.Ct. at 1881. Thus, the rule served the important governmental interest in security; it was content-neutral; and it left available alternative means of obtaining reading material which were not shown to be burdensome or insufficient. *Id.* at 552, 99 S.Ct. at 1881.

In contrast, no alternative means of communicating with inmates in other institutions were available in the instant case. While phone calls to outsiders were permitted under certain conditions, *see* Tr., Vol. V at 60–64, phone calls to other inmates within the system were prohibited. *Id.* at 62. Moreover, we do not think a letter presents the same sort of "obvious security problem" as does a hardback book. Appellants concede that the primary concern with respect to mail between institutions was the possibility of making plans for escapes, riots, and the like. Appellants' Brief at 15. Yet in the daily operation of the correspondence policy now being challenged, Earl Engelbrecht, a Renz supervisor, examined, opened and scanned the contents of all mail between inmates not on his "approved" list. *Id.* at 4–5; Tr., Vol. V at 80–81, 96–97. This task, Engelbrecht testified, took approximately one hour a day. Tr., Vol. V at 70, 96–97. Under these circumstances, and considering the core First Amendment right involved, we believe that neither *Jones* nor *Wolfish* requires application of a rational basis standard to the issue of inmate-to-inmate mail.

Our own previous decisions do not change this conclusion. In *Rogers v. Scurr,* 676 F.2d 1211 (8th Cir.1982), we held that a prison regulation prohibiting the wearing of prayer caps and robes outside of religious services was reasonable. *Id.* at 1215. We noted that, although restrictions on First Amendment rights generally should be no greater than necessary to protect the governmental interest involved, prison officials must be given wide latitude when maintenance of institutional security is at issue. The plaintiff inmates,

members of the Islamic faith, were permitted to congregate five times daily for prayer, were provided the pork-free diet required by their religion, and were served the special meals of the holy month of Ramadan. *Id.* at 1213. " 'So long as the prison authorities provide the inmate with a reasonable opportunity for the exercise of his religious tenets in a form that is substantially warranted by the requirements of prison safety and order, there is no violation of the inmate's constitutional rights.' " *Id.* at 1215–16 (quoting *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 863 (4th Cir.1975) ). *See also Otey v. Best,* 680 F.2d 1231 (8th Cir.1982) (upholding prison regulation prohibiting inmates subject to death penalty from attending worship services with general prison population; Muslim plaintiff was allowed visits by Muslim religious leader, was provided with special diet, and had access to religious literature and broadcasts).

In both *Rogers* and *Otey, supra,* the prison rules in question were essentially regulations of the time, place, or manner in which an acknowledged First Amendment right could be exercised. In both cases, the right of free exercise of religion was not completely deprived but was merely limited to the extent necessary to conform to security needs. Alternative means were provided by which the inmates could adhere to their religious tenets.

Closer in point is our recent decision in *Gregory v. Auger,* 768 F.2d 287 (8th Cir. 1985). There, an inmate challenged a prison regulation prohibiting the receipt of all but first class mail while an inmate was on disciplinary detention status (DD1). Inmates were placed on DD1 status for no longer than sixty days. *Id.* at 290. The rule was designed to make DD1 status less pleasant than being out in the general prison population, so as to deter future misconduct. *Id.* We upheld the regulation because of its temporary nature and because of the need of prison officials to " 'have available sanctions that impose incremental disadvantages on those already impris-

oned.'" *Id.* (quoting *Daigre v. Maggio*, 719 F.2d 1310, 1313 (5th Cir.1983)). We observed that "the Reformatory could properly have established mail policies far more restrictive than this, so long as the disciplinary withholding of mail was only to be temporary." *Id.*

In the case at bar, however, the mail restrictions were neither temporary nor disciplinary. Although past misconduct was considered by the classification/treatment team in deciding whether an inmate should be "approved" for inter-institutional correspondence, it was but one of several factors. Moreover, the chairman of the team testified that decisions on inmate-to-inmate mail were usually made before they reached the classification team; inmates would stop the superintendent or a supervisor in the hallway and receive a decision on the spot. Tr., Vol. II at 148. The *Gregory* decision teaches that a prisoner mail prohibition is a serious infringement of First Amendment liberties, permissible only in narrowly circumscribed settings such as existed there.

 We conclude that the exchange of inmate-to-inmate mail is not presumptively dangerous nor inherently inconsistent with legitimate penalogical objectives. We therefore affirm the district court's application of the *Martinez* strict scrutiny standard and its decision finding the Renz correspondence rule unconstitutional.

## THE MARRIAGE RULE

Two regulations concerning marriage are at issue. Prior to December 1, 1983, the rule ("the old rule") set out the procedure to be followed when an inmate desired to marry. The thrust of the old rule was to place responsibility for any and all preparations upon the inmate, and to make clear that any assistance from prison officials would be secondary to the normal functions of the institution. While the rule was silent as to the giving or withholding of permission to marry, Superintendent Turner testified that he believed he had the inherent power to deny permission by virtue of Missouri statutes "which allow me to control my institution." Tr., Vol. I at 70.

On December 1, 1983, a new marriage regulation ("the 1983 rule") was promulgated. Under the 1983 rule, an inmate desiring to marry had to file a written request stating reasons for the marriage. The superintendent was given authority to approve the request "when there are compelling reasons to do so," and to disapprove the request if "the wedding would pose a threat to the security and operation of the institution." While both rules appear applicable to marriages between inmates and outsiders, the record refers only to proposed marriages between two inmates.

The district court apparently assumed that the marriage rules were intended to serve the legitimate state interests in security and rehabilitation. *Safley*, 586 F.Supp. at 594. The court held the rules unconstitutional because they were "far more restrictive than is either reasonable or essential for the protection" of those interests. *Id.* (citations omitted). The court thus effectively applied the *Martinez* standard, *see Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811, albeit without reference to that decision. As with the correspondence regulation, appellants argue the court should have applied a reasonableness standard.

It is well settled that the decision to enter into a marital relationship is a fundamental human right. *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Appellants initially contend, however, that a prisoner has no right to have a marriage ceremony performed in prison. In support of this proposition, appellants cite us to *Johnson v. Rockefeller*, 365 F.Supp. 377 (S.D.N.Y.), *aff'd without opinion sub. nom.*, *Butler v. Wilson*, 415 U.S. 958, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1973); *Polmaskitch v. United States*, 436 F.Supp. 527 (W.D.Okla.

1977); and *Wool v. Hogan*, 505 F.Supp. 928 (D.Vt.1981). We find this contention to be without merit.

■ Both *Johnson* and *Wool, supra*, determined that a restriction on a prisoner's right to go through the formal ceremony of marriage does not amount to an infringement on a fundamental right because those aspects of a marriage which make it a basic civil right—"cohabitation, sexual intercourse, and the begetting and raising of children"—are already precluded by the fact of incarceration. *Johnson*, 365 F.Supp. at 380; *Wool*, 505 F.Supp. at 932. This argument ignores the elements of emotional support and public acknowledgement and commitment which are central to the marital relationship. Moreover, it is contrary to the *Zablocki* Court's interpretation of the decision to marry as being distinct from, but equally as important as, decisions relating to procreation and other family matters.

> [T]he decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. * * * [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society.

*Zablocki*, 434 U.S. at 386, 98 S.Ct. at 681. In *Polmaskitch, supra*, the court first determined that it had no jurisdiction of the case, and then went on to decide that a prisoner has no fundamental right to marry while incarcerated. We need not give precedential value to a decision made without jurisdiction. Thus, we hold that an inmate's decision to marry is a fundamental right protected by the Constitution. *See Bradbury v. Wainwright*, 718 F.2d 1538, 1540 (11th Cir.1983).

Appellants' main argument is the same as that advanced in connection with the mail rule—that is, the district court applied the wrong legal test. They rely on *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as well as our own decision in *Otey v. Best*, 680 F.2d 1231 (8th Cir.1982). We discussed these cases *supra* and we adhere to our earlier analysis.

All three decisions involved regulations of the time, place or manner in which a particular right could be exercised, and all three regulations left open other means of exercising that right. Thus, the union materials in *Jones* could have been mailed individually to prison inmates rather than by bulk mail. 433 U.S. at 130 n. 8, 97 S.Ct. at 2540 n. 8. The pretrial detainees in *Wolfish* were permitted to receive all soft-covered reading materials, could receive hardback books directly from publishers, book clubs and bookstores, and had access to hardback books in the prison library. 441 U.S. at 552, 99 S.Ct. at 1881. And the Muslim death row inmate in *Otey*, while prohibited from attending worship services with the general prison population, was allowed religious visits and services in his cell, adherence to Islamic dietary requirements, and access to Muslim literature and broadcasts. 680 F.2d at 1232.

■ Here, in contrast, both the old marriage rule as it was applied by Superintendent Turner and the 1983 rule on its face absolutely prevent those inmates denied permission from getting married. There are no alternative means of exercising that right. When a government-imposed regulation "significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388, 98 S.Ct. at 682 (citations omitted); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1033 (2d Cir.1985) (where official action works to deprive rather than merely limit the means of exercising a protected right, judgment of prison officials must be scrutinized under the *Martinez* standard). We therefore affirm the district court's application of strict scrutiny in evaluating the marriage rules.

## THE DISTRICT COURT'S FINDINGS OF FACT

Finally, appellants contend that certain of the district court's findings of fact are clearly erroneous. Fed.R.Civ.P. 52(a). We may not overturn findings of fact unless, after a review of the entire record, we are left with the definite and firm conviction that a mistake has been committed. *Pullman-Standard v. Swint*, 456 U.S. 273, 284 n. 14, 102 S.Ct. 1781, 1788, n. 14, 72 L.Ed.2d 66 (1982); *Aetna Casualty & Surety Co. v. General Electric Co.*, 758 F.2d 319, 323 (8th Cir.1985). As to each challenged finding, appellants concede there is supporting testimony but argue that the district court gave improper weight or significance to the finding. Having thoroughly examined the record and found substantial evidence to support each finding of fact, we hold the district court's findings are not clearly erroneous.

The thrust of appellants' argument seems to be that, even assuming the findings of fact are correct and the proper legal standard was applied, the facts of this case do not warrant the conclusion that the mail and marriage rules are unconstitutional. Since the district court based its decision on the failure of the rules to meet the least restrictive alternative requirement, we take this to be an argument that the court erred in holding that the mail and marriage rules were not the least restrictive means of serving the prison officials' objectives of security and rehabilitation.

The mail rule permitted correspondence between unrelated inmates "if the classification/treatment team of each inmate deems it in the best interest of the parties involved." While there was testimony that the question whether correspondence between two particular inmates was in their best interests was submitted to the classification/treatment team, there was other testimony indicating that in fact the team was rarely consulted. The mail room supervisor, Engelbrecht, typically rendered a decision either at the time an inmate requested permission from him or when an inmate simply went ahead and wrote a letter which was then intercepted in the mail room and diverted to Engelbrecht. The orientation booklet given to inmates on arrival at Renz stated that no correspondence between non-family inmates was permitted, apparently in the hope that inmates would be discouraged from attempting to write.

The testimony also revealed that the principal reason for refusal of inmate-to-inmate mail was the prison officials' belief that female inmates should avoid any personal relationships, friendly or romantic, with male inmates. Such relationships are detrimental to the women's rehabilitation, according to Superintendent Turner, because they may find themselves the victims of abuse which, presumably, may in turn lead them back to criminal activities. Additionally, mail was refused on the ground of security on the theory that it may contain plans for escape, violent uprisings or other illegal activities. Marriages were denied on the basis of the same protective concerns, as well as the belief that possible "love triangles" would generate violent confrontations between inmates. No specific incident of the realization of any of these concerns, involving these or any other inmates, was alleged or shown.

We agree with the district court that stopping mail and preventing marriages are not the least restrictive means of achieving these objectives. With respect to rehabilitation, efforts such as counseling, teaching of job skills to promote independence, or development of outside interests to increase the inmate's self-image and self-respect would certainly be permissible ways to help an inmate avoid detrimental relationships without impinging on the right to exchange letters with another or the right to marry. In our view, without strong evidence that the relationship in question is or will be abusive, the connection between permitting the desired correspondence or marriage and the subsequent commission of a crime caused thereby is simply too tenuous to justify denial of those constitutionally protected rights. As to the security concerns, we think the prison officials' authority to open and read all

prisoner mail is sufficient to meet the problem of illegal conspiracies. As we discussed earlier, appropriate time, place or manner regulations are also permissible. And the development of violent "love triangles" is as likely to occur without a formal marriage ceremony as with one. Refusing to permit a wedding would not necessarily prevent such confrontations.

## CONCLUSION

In sum, we affirm the district court's use of strict scrutiny in evaluating the constitutionality of the inmate correspondence and marriage regulations, we hold the court's findings were not clearly erroneous, and we uphold the court's conclusion that the regulations in question are unconstitutional.