John B. VESTER, Appellant,

v.

W.P. ROGERS, Warden, Powhatan Correctional Center & Allyn R. Sielaff, Director, Virginia Department of Corrections, Appellees.

No. 85–6639.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1986.

Decided July 18, 1986.

Scott M. Kleger, Third-Year Law Student, Post-Conviction Assistance Project, University of Virginia School of Law (Professor Stephen A. Saltzburg, Supervising Atty., Charlottesville, Va., on brief) for appellant.

Richard F. Gorman, III, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., Richmond, Va., on brief) for appellees.

Before RUSSELL, HALL, and MURNAGHAN, Circuit Judges.

K.K. HALL, Circuit Judge:

John B. Vester, an inmate in the Virginia penal system, appeals from an order of the district court granting summary judgment on behalf of officials of the Virginia Department of Corrections (the "Department") in an action brought pursuant to 42 U.S.C. § 1983. Vester's complaint alleged that the Department's Guideline 851, which

prohibits correspondence between inmates in different penal institutions without permission of the wardens involved, is an unconstitutional intrusion into an inmate's first amendment rights. We affirm. Because the first amendment implications of restrictions on prisoner-to-prisoner correspondence have not been fully addressed in this Circuit, some additional explanation is required.

## I.

Vester was committed to the Virginia Department of Corrections in July of 1984 and was initially sent to the Powhatan Receiving and Classification Center ("Receiving Center"). While at the Receiving Center, he became acquainted with another inmate, Gary Boggs, with whom he shared an interest in certain legal issues. In October, 1984, Vester was transferred to the Powhatan Correctional Center. Shortly thereafter, without seeking official permission, he wrote to Boggs. Upon delivery of the letter to the Receiving Center, institutional personnel returned it as unauthorized correspondence.

Vester then filed a grievance under the Department's Inmate Grievance Procedure. At the Level I informal response stage, he was informed that correspondence between inmates at different institutions was subject to the restrictions contained in Guideline 851 ("DGL 851"). DGL 851 provides, in part, that "[c]orrespondence shall not be permitted with inmates serving sentences in other institutions under the authority of the Department of Corrections unless the Wardens/Superintendents of the involved institutions determine that such correspondence is in the best interest of both inmates and the institution." Vester subsequently appealed his grievance to the Level I formal committee, which concluded that the

issue should be reviewed by the Attorney General's office.

Vester chose not to return his copy of the grievance to the Attorney General, thereby terminating the administrative procedure short of exhaustion. Instead, he and another inmate, Jonathan Tuller, brought an action pursuant to 42 U.S.C. § 1983 against W.P. Rogers, Warden of the Powhatan Correctional Center and Allyn R. Sielaff, Director of the Virginia Department of Corrections. The complaint alleged that DGL 851 was an overly broad intrusion into rights protected by the first and fourteenth amendments. Plaintiffs sought to have the regulation declared unconstitutional and to enjoin its enforcement. Vester and Tuller also requested both compensatory and punitive damages. Subsequently, Tuller voluntarily withdrew from the action.

The Department moved for summary judgment and the district court granted the motion. In doing so, the court first determined that DGL 851 was a reasonably drawn regulation intended to protect a legitimate state interest in prison security. Accordingly, the regulation was held to be a constitutional limitation on prisoner speech in conformity with the standard established by the United States Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).[1] The district court further held that Vester's failure to comply with the procedural requirements of the regulation precluded consideration of any claim that the regulation as applied to him was improper. This appeal followed.

## II.

On appeal, Vester's primary contention is that the district court misapplied the test of

---

**1.** The Court stated the *Procunier* test as follows:
First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail

censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.
416 U.S. at 413, 94 S.Ct. at 1811.

*Procunier v. Martinez.* He argues that the standard established in that decision is one of strict judicial scrutiny which requires proponents of a regulation limiting first amendment rights to defend against a charge of overbreadth by demonstrating that the regulation is the least intrusive alternative available. Vester argues that the district court's failure to require the Department to prove that DGL 851 is preferable to other less expansive methods of protecting institutional security constitutes reversible error. In support of his position, Vester cites the recent decision of *Safley v. Turner,* 777 F.2d 1307 (8th Cir.1985), in which the Eighth Circuit Court of Appeals determined that a Missouri prison regulation substantially identical to DGL 851 was unconstitutional under the *Procunier* test.

We find that Vester's argument falls prey to the same error as did the Eighth Circuit in *Safley.* By focusing excessively upon the *Procunier* test, Vester, like the Eighth Circuit, fails to recognize the impact of a continuing effort by the Supreme Court in cases such as *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), *Jones v. North Carolina Prisoner's Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), to articulate the standards by which penal officials may regulate their institutions.[2]

We must note initially that the Supreme Court has not dealt with the precise factual circumstance posed in this case. Nor have the first amendment implications of regulations limiting prisoner-to-prisoner correspondence been addressed by this Court. *Procunier* dealt with a California Department of Corrections rule restricting correspondence between inmates and non-prisoners. Indeed, the Court therein expressly based its ruling not on "prisoner rights" but on the fact that the challenged regulation caused a "consequential restriction on the first and fourteenth amendment rights of those who are *not* prisoners." 416 U.S. at 409, 94 S.Ct. at 1809 (emphasis added).

To the extent, therefore, that the *Procunier* test is relevant to regulations affecting only prisoners, the process of applying the standard is subject to the well-established policy of judicial deference to the reasonable decisions of prison administrators. The Court in *Procunier* noted that the task of maintaining an orderly prison was "Herculean" and required a specialized expertise which courts were ill-equipped to supply. 416 U.S. at 404–05, 94 S.Ct. at 1807. Deference gave way to strict scrutiny in *Procunier* not because a prisoner's first amendment rights were affected but because prison officials extended a rule outside their area of responsibility.

This distinction between deference and strict scrutiny was further illustrated in *Pell v. Procunier.* The Court upheld a California regulation that absolutely prohibited "press and other media interviews with specific inmates." 417 U.S. at 819, 94 S.Ct. at 2802. Unlike *Procunier v. Martinez,* the rule at issue in *Pell* limited only the first amendment rights of prisoners.[3] In that context the Court held that "in the absence of substantial evidence in the record to indicate that officials have exaggerated their response ... courts should usually defer to their expert judgment in such matters." 417 U.S. at 827, 94 S.Ct. at 2806.

---

**2.** In reaching the merits of Vester's appeal, we reject as meritless the Department's contention that his failure to seek permission to correspond renders his claim hypothetical and conjectural. The Department's reliance on our opinion in *Doe v. Duling,* 782 F.2d 1202 (4th Cir.1986), is substantially misplaced. In *Doe,* we concluded that no genuine case or controversy existed where two individuals who had sought to challenge a Virginia statute prohibiting fornication and cohabitation had neither been charged under the statute nor could show any real or immediate threat of prosecution. In the present

case, however, Vester can show not only a likelihood that DGL 851 will be applied to him but that it has actually been used to restrict his conduct. *Doe* is, therefore, factually inapposite.

**3.** The Court held that a journalist's first and fourteenth amendment rights were not abridged by a penal regulation limiting media access to sources of information to the same level available to the general public. 417 U.S. at 834–35, 94 S.Ct. at 2810–11.

The Supreme Court retained its analytical focus on the absence of exaggerated response in *Jones v. North Carolina Prisoner's Labor Union, Inc.*, where the Court upheld certain regulations which limited prisoner speech with regard to the operation of a prisoner union. The district court had originally found the regulations defective because no evidence had been presented to show that the union had been utilized to disrupt the institution. In reversing, the Supreme Court stated that "[t]he District Court ... got off on the wrong foot in this case by not giving appropriate deference to the decisions of prison administrators...." 433 U.S. at 125, 97 S.Ct at 2537.

The Court in *Jones* noted that state correctional officials had testified with regard to the potential dangers connected with an unregulated prisoner labor union. The Court then held that

> Without a showing that these beliefs were unreasonable, it was error for the District Court to conclude that appellants needed to show more. In particular, the burden was not on appellants to show affirmatively that the Union would be "detrimental to proper penological objectives" or would constitute a "present danger to security and order." ... Rather, "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S., at 827, 94 S.Ct., at 2805. The necessary and correct result of our deference to the informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning institutional operations in situations such as this.

433 U.S. at 127–28, 97 S.Ct. at 2538–39.

The *Pell-Jones* rationale was reaffirmed in *Bell v. Wolfish*, where the Court sustained a variety of regulations and internal practices utilized in a federally-operated custodial facility in New York. Again the Court found no evidence of an "exaggerated response" by prison officials. With regard to those rules that directly affected inmate first amendment rights the Court found them acceptable as long as they were reasonable and operated "in a neutral fashion without regard to the content of the expression." 441 U.S. at 551, 99 S.Ct. at 1880–81, (quoting *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972)).

### III.

Although "a prisoner does not shed his first amendment rights at the prison portals," *Brown v. Peyton*, 437 F.2d 1228, 1230 (4th Cir.1971), it is equally true that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *Price v. Johnson*, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). The question of whether a challenged regulation falls within the range of constitutionally permissible limitations turns in large measure upon the level of appropriate judicial scrutiny. Assuming, *arguendo*, that a regulation restricting communication between two prisoners must satisfy the *Procunier* formulation of embodying a substantial state interest while imposing no greater restriction than necessary, the ultimate burdens of production and persuasion with regard to the rule's validity remain linked to the degree of deference accorded the rulemaker.

We conclude that a two-part synthesis has emerged from the *Procunier, Pell, Jones* and *Bell* decisions. If a penal regulation either intrudes upon the first amendment rights of non-prisoners or constitutes a total denial of an inmate's right to free speech, including any possible alternative means of exercising that right, then the state must satisfy the *Procunier* strict scrutiny requirement. The burden of demonstrating both the substantial state interest and the absence of a less restrictive alternative rests upon the proponent of the rule. If, however, the rule operates only

as a limitation on a prisoner's first amendment rights, then the judicial deference normally accorded prison officials will in most instances defeat a claim of overbreadth. The court's inquiry is directed not toward whether the state has demonstrated an absence of less restrictive alternatives but whether the inmate challenging the regulation has shown by substantial evidence that the state has exaggerated its response to an institutional problem.[4]

■ Applying this rationale to the facts of the present case we find no substantive constitutional defect in DGL 851. The rule imposes certain limitations on one manner in which an inmate may exercise his first amendment rights. It does not, however, operate as an absolute denial of free speech. Nor does it affect the rights of nonprisoners. It must, therefore, be construed as a "time, place and manner" regulation of the type sustained in *Pell*.[5]

As a limitation on speech rather than a total denial of that first amendment right, the rule must be upheld if it is rationally related to the legitimate penological objectives of the penal institution. We conclude that DGL 851 is such a reasonable response to valid concerns relating to institutional security. The Department has articulated its need to impose a limit on the flow of information between inmates as a means of reducing institutional tensions and impeding the exchange of communication relating to unlawful activity. We have no reason to believe that this position is not an accurate depiction of the requirements of penal administration.

On appeal, Vester does not dispute that the institutional concerns which gave rise to DGL 851 are genuine. Rather, he argues that less restrictive means of protecting those concerns, such as letter-by-letter censorship or a rule limiting only those prisoners specifically identified as security threats, would equally serve the institution's goal. As we have stated, however, the availability of alternatives is not relevant if a penal regulation only limits rather than denies a constitutional right. Vester's burden was to overcome the presumption of constitutionality to which a reasonable penal regulation is entitled by demonstrating an exaggerated response on behalf of the promulgators of the rule. We find that Vester has not met this burden. We hold, therefore, that DGL 851 is a constitutionally valid effort by Virginia penal officials to insure the orderly operation of that state's prisons.

**4.** Although we articulate this position for the first time today, we note that it is consistent with our earlier decisions on prison regulation. *Cf. Pittman v. Hutto,* 594 F.2d 407 (4th Cir. 1979), in which this Court sustained limitations imposed upon a prisoner-operated publication based upon the reasonable conclusion of prison officials that the full exercise of the first amendment rights possessed a likelihood of prison disruption *with Barrett v. Commonwealth of Virginia,* 689 F.2d 498 (4th Cir.1982), in which we subjected a Virginia statute that absolutely prohibited legal name changes by inmates to the stricter scrutiny of *Procunier.*

To the extent that there is any contrary language in the unpublished decision of *Parker v. McKenzie,* 577 F.2d 736 (4th Cir.1978), cited in appellant's brief, we do not find it controlling. *Parker* dealt with a challenge to the methods employed by West Virginia prison officials to regulate inmate correspondence. The complaint in that case alleged, *inter alia,* that proper notice and an opportunity to appeal were not provided. The question was therefore one of procedural rather than substantive due process. The discussion in *Parker* with regard to the underlying constitutionality of the prison regulation in that case must be seen, therefore, as *dicta.* The usually diminished precedential value of such *dicta* is further reduced when it is taken from an unpublished decision, a practice not favored by our own local procedure. *See* Fourth Circuit Internal Operating Procedures— 36.5.

**5.** Appellant seeks to distinguish *Pell* from the present case in the same manner as did the Eighth Circuit in *Safley.* He contends that unlike *Pell*'s "time, place and manner" regulation, DGL 851 is an absolute limitation on free speech. We find appellant's argument unpersuasive.

DGL 851 addresses correspondence, not communication. Even if the regulation totally prohibited correspondence between inmates of different institutions, which it clearly does not, communication would be possible through nonprisoner intermediaries such as family, friends, clergy, etc. The Court in *Pell* found this mechanism an adequate alternative form of communication. We fail to see, therefore, why DGL 851 is any less a "time, place or manner" regulation than was the rule at issue in *Pell.*

We emphasize that our decision today addresses only the substantive validity of DGL 851. We agree with the district court that Vester's failure to comply with the administrative requirements of the rule precludes any consideration of whether there is any constitutional defect in the procedural operation of the rule.

### IV.

For the foregoing reasons, we conclude that the district court properly granted summary judgment in favor of the defendants below. The district court's order is, therefore, affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

I dissent because the majority, under the guise of enunciating a test which synthesizes previous Supreme Court precedent relating to prisoners' first amendment rights, has, in effect, placed an insuperable burden on prisoners and taken from them the rights which they retain even in the restrictive constitutional setting of a prison. In its desire to afford prison administrators discretion in the difficult business of running a penal institution, a principle to which, when it is stated abstractly, I strongly adhere, the majority has given those officials *carte blanche* to restrict prisoners' communications with one another. It is important to bear in mind that decision making for judges is choosing between, or, if possible, reconciling competing principles, and it does not do perfunctorily to nod at one principle but thereafter wholly to avoid its application.

After paying lip service to the principle that " 'a prisoner does not shed his first amendment rights at the prison portals,' " the majority proceeds quickly to the "two-part synthesis" which it states "has emerged from the *Procunier*,[6] *Pell*,[7]

*Jones*[8] and *Bell*[9] decisions." At 1182. The first part of the test involves penal regulations which "either intrude[ ] upon the first amendment rights of non-prisoners or constitute[ ] a total denial of an inmate's right to free speech, including any possible alternative means of exercising that right." (*Id.*). There, "the state must satisfy the *Procunier* strict scrutiny requirement." In the second instance, where a regulation "operates only as a limitation on a prisoner's first amendment rights, then the judicial deference normally accorded prison officials will in most instances defeat a claim of overbreadth." *Id.* at 1182–1183.

The majority errs in its neat division of previous prisoners' rights cases into two categories. The cases which it cites in support of its formulation, *Procunier*, *Pell*, *Jones*, and *Bell*, do not lend themselves to a gloss of the first amendment rights of prisoners which, as the majority candidly states, "will in most instances defeat a claim of overbreadth." As stated by the majority, a prisoner must be deprived of *all* means of communicating, be subjected to a "total denial" of his right to free speech, before he is entitled to the strict scrutiny requirement. The alternative is the highly deferential, essentially nugatory inquiry as to whether an inmate "has shown by substantial evidence that the state has exaggerated its response to an institutional problem." At 1183. An inmate's first amendment rights would be placed deep in the deep freeze by such an approach, which forces him to sacrifice legitimate and protected speech, as well as that which may be properly restricted. An inmate may never be able to shoulder the burden of showing complete restriction of his rights, since prison officials may still be able to argue the availability of alternative channels or come up with reasons why their response was not exaggerated.

**6.** 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

**7.** 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

**8.** 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

**9.** 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In the case at hand, Vester sought to communicate with Boggs on matters relating to Boggs' post-conviction relief. Such communication, far from being improper, was of the sort which is not "shed" by a prisoner when he enters the "prison portals." *Brown v. Peyton*, 437 F.2d 1228, 1230 (4th Cir.1971). *See Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).[10] The right to communicate on legal matters does not seem, *prima facie*, "inconsistent with [Vester's] status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804. Yet, under the majority's opinion, deference would necessarily be shown to prison authorities since a prisoner could not effectively shoulder the burden of showing that he had no remaining means of communicating or that the prison officials' response was exaggerated.[11] Although the Virginia guideline suggests that the prison authorities have the power to grant permission to an inmate to communicate to a fellow prisoner, there is no assurance that under the vague standard of that regulation (the "correspondence is in the best interest of the inmate and the institution") first amendment interests would be addressed. No standards whatever are enunciated to guide precommunication censorship. The district court voiced a concern that even innocuous mail might "contain encoded messages." But, if prison authorities voiced such a justification, consonant with their concern for institutional security, it would be difficult, indeed, as a practical matter, impossible, for a prisoner to counter with evidence that their response was exaggerated, under the deferential approach suggested by the majority's opinion. The more innocuous a statement might seem, the more devious at cryptography the authorities might assert the would-be communicator to be.

More importantly, I believe that the majority has read the cases in the area of prisoner's rights in a way which makes anything but the most transparently sophistical and unsubstantiated enunciation by officials of a justification for a regulation affecting speech pass constitutional muster. The majority goes beyond previous cases by requiring a showing that first amendment rights have been totally obliterated. The majority warns against "focusing excessively" upon the test of *Procunier v. Martinez, supra,* but, in its complete deference to the justifications proffered by prison officials, it bypasses not only *Procunier,* but *Pell, Jones,* and *Bell.* A brief overview of Supreme Court precedent in the area indicates that the majority has erred in the formulation of its "synthesis."

In *Procunier v. Martinez,* where the Court found unconstitutional a California regulation which subjected certain classes of correspondence between prisoners and non-prisoners to censorship, the Court stated that it was "unnecessary" to examine the question of whether the first amendment rights of prisoners, *per se,* were implicated in the prisoner regulation because

**10.** In *Johnson v. Avery*, 393 U.S. at 490, 89 S.Ct. at 751, the Court noted that "the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief.... But unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners." Thus before the regulation here was deemed "reasonable" on grounds relating to prison discipline, the district court was required to conduct an inquiry whether it restricted inter-prisoner communication in such a way as to cut off the right of prisoners to assist one another in formulating post-petition conviction relief. There has been no showing here of actual or potential abuse.

**11.** In the present case the record is not clear whether Vester could, in fact, communicate with a prisoner in another institution by any means other than the mails. The guideline in question flatly states that "[c]orrespondence [*i.e.,* communication] shall not be permitted with inmates serving sentences in other institutions under the authority of the Department of Corrections unless the wardens/superintendents of the involved institutions determine that such correspondence is in the best interest of both the inmate and the institution."

the correspondence in question in the case worked as a "consequential restriction of the ... rights to those who are not prisoners." 416 U.S. at 409, 94 S.Ct. at 1809. The Court did not state its holding exclusively in terms of the rights of non-prisoners: it explicitly stated that such a restriction also implicated the rights of prisoners.

> *The interest of prisoners and their correspondents* in uncensored communications by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment *even though qualified of necessity by the circumstances of imprisonment.*

*Id.* at 418, 94 S.Ct. at 1814 (emphasis provided). Although the language emphasized is not entirely free from ambiguity, it indicates that the first amendment rights of prisoners, as far as they involve "uncensored communication by letter," cannot be dismissed as a freedom which the prisoner sheds at the prison gates.

The additional cases in the continuum of prisoners' rights cases considered by the Court subsequent to *Procunier v. Martinez* do not take from prisoners their first amendment right of free communication by mail enunciated in *Martinez.* Indeed, in *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), the Court reiterated the proposition "that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." The Court noted further that the availability of other channels of communication for a prisoner had to be taken into account in "balanc[ing]" first amendment interests against "legitimate governmental ... interests." *Id.* at 823–24, 94 S.Ct. at 2804–05. The Court's formulation in *Pell* thus does not support the majority's view that a restriction on prisoner's first amendment rights must rise to the level of a "total denial ..., including

any possible alternative means of exercising that right" before it offends the Constitution. The balancing mandated by *Pell* is not nearly as deferential as the minimal scrutiny suggested by the majority.

The next case which the majority believes supports its formulation of its "synthesis," *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), involved the solicitation of inmates by one another to join a prisoner's union, which was not itself prohibited by authorities. The Court found the authorities' restriction of inmate solicitation of other inmates, meetings between members of the union, and bulk mailings related to the union from outside sources did not violate the first amendment rights of prisoners. The Court stated that "[p]erhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are associational rights that the First Amendment protects outside of prison walls.... [T]he inmate's 'status as a prisoner' and the operational realities of a prison dictate restrictions on the associational rights among inmates." 433 U.S. at 125–26, 97 S.Ct. at 2537–38.

As indicated by the Court, there is also, in terms of the strain on prison facilities, an obvious distinction between an exchange of personalized letters between two discrete individuals and indiscriminate bulk mailings to hordes of others. In *Jones,* the Court noted that "[m]ail rights are not themselves implicated; the only question respecting the mail is that of *bulk* mailings." *Id.* at 130, 97 S.Ct. at 2540. The prisoners retained "other avenues of outside informational flow by the Union," [12] so that "the prohibition on bulk mailing, reasonable in the absence of First Amendment considerations, remains reasonable." *Id.* at 131, 97 S.Ct. at 2540.

The final case relied on by the majority, *Bell v. Wolfish,* reiterated previous principles addressed by the Court in the context of a prison rule requiring books and maga-

---

**12.** It should be noted that the Court, contrary to the majority's formulation of its test, does not state that *all* avenues of communication by pris-

oners be foreclosed, but rather that there be "other avenues" available to prisoners.

zines sent from outside a penal institution to be sent directly to prisoners from the publisher or a book club. The Court enunciated four major principles derived from its previous cases: (1) prisoners do not forfeit all constitutional rights because of confinement in prison; (2) the purpose and rationale of the penal system necessarily means that prisoners are deprived of "many privileges and rights"; (3) among the proper goals of a penal system are the maintenance of "institutional security and preserving internal order and discipline"; (4) "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. at 545–47, 99 S.Ct. at 1877–78.

None of the principles reiterated in *Bell v. Wolfish* can be taken to the length suggested by the majority opinion. In the present case, there has been no showing that there are available alternative means of communication for the prisoner to communicate with a fellow prisoner on matters relating to post-conviction relief. Unlike *Jones,* which involved associational rights, inevitably restricted in a penal setting, a case where mail rights were only tangentially concerned, the present case directly involves such rights. Unlike *Bell,* where alternative means of receiving outside communications (directly from publishers or book clubs) were explicitly sanctioned by the regulation in question, there was no showing here that such communications could be made among prisoners in different institutions. Even by the majority's standard—the "total denial of an inmate's right to free speech"—the regulation may offend first amendment principles, since there was no showing that the regulation did not foreclose *all* means of communication. But even if that is not the case, I believe that, under previous Court precedent, the majority's view of the first amendment rights of prisoners puts an impermissible burden on the exercise of such rights.